# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

---

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| LURIA NICOLE GREENE, | ) | |
| | ) | Case No. 10-51071-SCS |
| *Debtor.* | ) | |
| | ) | |
| LURIA NICOLE GREENE, | ) | |
| | ) | APN 11-05016-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF EDUCATION, | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial on September 7, 2012, upon the Amended Complaint filed by the Plaintiff, Luria Nicole Greene ("Ms. Greene"), an unrepresented debtor, against the Defendant, United States Department of Education ("United States").  At the conclusion of the trial and after the filing of a trial brief and reply by Ms. Greene (hereinafter respectively, "Brief" and "Reply Brief") and a response by the United States (hereinafter "United States Response"), the Court took this matter under advisement.[1]  The Court has jurisdiction over this proceeding pursuant to 28 U.S.C.

---

[1] At the conclusion of the evidence, Ms. Greene requested and the Court granted her twenty-one (21) days following the trial in which to file a trial brief and granted the United States fourteen (14) days to respond to Ms. Greene's trial brief.  The Court permitted Ms. Greene seven (7) days within which to file a reply to the response of the United States.  All briefs were timely submitted by the parties.  In addition, Ms. Greene filed an exhibit to her reply on October 25, 2012, consisting of copies of four (4) decisions from other courts involving student loans, which the Court also considered.

§§ 157(b) and 1334(b).   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).   This

Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52, as incorporated into the Federal Rules of Bankruptcy Procedure

by Rule 7052.

## I.   The Amended Complaint

The Amended Complaint of Ms. Greene ("Complaint") is succinct.[2]   She alleges that one of

the unsecured debts listed on her Schedule F is a student loan owed to the United States, which

consolidated certain student loans used to pay college tuition and expenses incurred prior to June

2004 ("Student Loan").   Am. Compl. ¶¶ 2-3.   Ms. Greene further alleges that since June 2004, when

the Student Loan was obtained, her income has been below the poverty level for her state of

residence and family size.   *Id*. ¶ 4.   Ms. Greene also alleges that the Student Loan has been in

repayment for approximately six and one half (6-1/2) years and that she has taken part in the income

contingent repayment plan (hereinafter "Income Contingent Plan").   *Id*. ¶ 8.   Ms. Greene also alleges

that:

> The Debtor suffers from Anxiety Disorder which is severe and negatively affects her
> ability to work.   This is an ongoing mental health condition recognized in the
> Diagnostic and Statistical Manual of Mental Disorders, 4th Edition.   This ongoing
> impairment greatly hinders the debtor's ability to substantially improve her level of
> employment, as does plaintiff's level of work experience which only includes low-
> paying jobs.

> As a result, Debtor is unable to significantly increase her income.

---

[2]   The United States filed a Motion for Judgment on the Pleadings as to the original
Complaint filed by Ms. Greene.   By order dated August 18, 2011, this Court granted in part and
denied in part the Motion for Judgment on the Pleadings and granted Ms. Greene leave to file an
Amended Complaint to more particularly plead the facts supporting her claim for relief.   Ms.
Greene timely filed the Amended Complaint.

*Id.* ¶¶ 6-7.  Ms. Greene additionally alleges that "[s]hould the defendant, in the future, forgive any portion of the [Student Loan] owed, the amount of the forgiveness would count as taxable income for the plaintiff.  Due to plaintiff's lack of assets, low income and the amount of the loan still owed, plaintiff would be unable to pay such taxes without great financial hardship."  *Id.* ¶ 8.  Finally, she alleges that she has no current or anticipated income or resources with which to pay the aforementioned loan, and her persistent poverty and low income would cause repayment of the Student Loan to render a great hardship to her and her child.  *Id.* ¶ 9.  Based upon these assertions, Ms. Greene prays that this Court enter an order declaring the Student Loan to be discharged.  *Id.* at 2.

The United States answered, admitting certain of Ms. Greene's allegations and denying the remainder.  Answer ¶¶ 1-10.  The United States prays that the Court enter an order finding that repayment of the Student Loan does not constitute an undue hardship to Ms. Greene and dismissing the Adversary Complaint.  *Id.* at 4.

## II.  Finding of Facts

### A.  The Stipulation

Prior to trial, Ms. Greene and the United States entered into an extensive Stipulation ("Stipulation") regarding Ms. Greene's educational background, the terms of the Student Loan, her income and expenses, and assets, which the Court accepted at trial.[3]  In summary, the Stipulation

---

[3] The Stipulation is set forth below.  The Court notes that the Stipulation contains two paragraphs numbered "6" and two paragraphs numbered "28," which numbering structure is retained herein.

1.  Plaintiff, Luria Nicole Greene, is 39 years old.

2.  Plaintiff does not hold a high school diploma.

3

3.  Plaintiff does hold two bachelor's degrees—a 4 year degree and a 1 year degree.

4.  Plaintiff attended Johns Hopkins University from September 1989–June 1993, where she obtained a Bachelor of Science degree in civil engineering with a cumulative grade point average of 2.32 on a 4.0 scale.

5.  Plaintiff attended graduate school at the University of Vermont for four semesters until approximately 1995 to study engineering, but did not obtain a degree.

6.  In the fall of 1995, Plaintiff enrolled part-time at the University of Maryland University College in a 30 credit second bachelor degree program with distance learning courses and in May 1998, obtained a Bachelor of Arts degree in management studies.

6.  From 1998 to 2001, Plaintiff was enrolled part-time in the distance education program at the University of Idaho in a second attempt to obtain a graduate degree in engineering, but was unsuccessful in obtaining such degree.

7.  In the fall of 1998, through the University of Idaho, Plaintiff took a non-credit course titled "Engineering Fundamentals" to prepare for the Fundamentals of Engineering Exam, the first step in obtaining a professional engineering licensing [*sic*] which is required for employment as a professional engineer.  She never did take the examination because she never felt she knew enough to be able to pass that exam.

8.  Plaintiff enrolled at Strayer University part-time for 2 semesters, completing courses in management during the Fall 2003–Spring 2004.  She did not earn a degree.  Plaintiff's last enrollment in college was during the Spring 2004.

9.  On October 12, 2004, Plaintiff obtained a Federal Direct Consolidation Loan under the William D. Ford Direct Loan Program from the United States Department of Education ("DOE") to consolidate the student loans she had borrowed to finance her higher education.  She applied on-line and executed an electronic promissory note.  The loan is repayable under the income contingent repayment plan and bears interest at the fixed rate of 4.375%.

10.  The school loan at issue is a Federal Direct Consolidation Loan under the William [D. Ford] Direct Loan Program under Title IV, Part D of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087a *et seq.* (34 C.F.R. Part 685).

11.  The Federal Direct Consolidation Loan consolidated all of Plaintiff's educational loans at a lower interest rate.  The oldest loans included in the consolidation were

4

obtained 23 years ago in 1989, when plaintiff was 16 years old.

12.   The October 12, 2004 promissory note specifies that the Federal Direct Consolidation Loan will be repaid under the income contingent repayment plan.

13.   On November 8, 2004, the Federal Direct Consolidation Loan was disbursed. Payment was fixed by DOE at $0.00 for a maximum repayment period of 25 years, subject to annual adjustments for changes in borrower Adjusted Gross Income as reflected on filed federal income tax returns or in borrower earned income as reflected on Alternative Documentation of Income forms.  Nontaxed income, such as child support or welfare benefits, is not used to determine monthly payment amounts under the income contingent repayment plan.

14.  Interest began to accrue December 1, 2004 and the first payment due date was December 28, 2004.

15.   The original principal balance was $171,607.61.   However, interest was capitalized annually, according to the terms of the income contingent repayment plan, until the principal balance was approximately 10 percent higher than the original principal balance.  On September 29, 2010, the principal balance reached its present level: $191,302.73.

16.  On September 21, 2011, the unpaid balance of the Federal Direct Consolidation Loan was $227,109.98, consisting of $191,302.73 in principal and $35,807.25 in interest.

17.  On September 7, 2012, the unpaid balance of Federal Direct Consolidation Loan will be approximately $234,998.13.

18.  The Federal Direct Consolidation Loan now accrues interest at a daily rate of $22.91, which equals an annual rate of $8,362.15 based upon a 365 day year.  This equals an approximate monthly rate of $696.85.

19.  At the current fixed payment of $0.00, after the 25 year repayment period ends in November 2029, the balance of the Federal Direct Consolidation Loan will be between approximately $378,549.23 and approximately $379,154.81.  In accordance with the income contingent repayment terms, the loan balance will be forgiven at the end of the twenty-five year repayment period.

20.  Because Plaintiff's Adjusted Gross Income since the loan has entered repayment has always been less than the Poverty Level Guidelines established by HHS, her payment under the income contingent repayment plan has always been $0.00 each

month.

21.  Plaintiff's current payment under the income contingent repayment plan is $0.00.

22.  Plaintiff is not in default on the payment of the Federal Direct Consolidation Loan.

23.  As the maximum repayment period under the income contingent repayment plan is twenty-five years, approximately 207 months remain on the repayment period for the Federal Direct Consolidation Loan.

24.  Plaintiff received the following nontaxable child support payments:

| Year | Annual Amount |
|------|---------------|
| 2008 | $13,152 |
| 2009 | $13,452 |
| 2010 | $13,752 |
| 2011 | $14,052 |

25.  Plaintiff received the following nontaxable Supplemental Nutrition Assistance Payment (SNAP) benefits, otherwise known as food stamps:

| Year | Annual Amount |
|------|---------------|
| 2009 | $ 800 |
| 2010 | $1,800 |
| 2011 | $1,800 |

26.  Currently, Plaintiff is receiving $552.01 in child support payments every two weeks and $163.00 each month in food stamps (SNAP Benefits).  Plaintiff receives approximately $1,196.00 per month in child support.

27. From the year she obtained the Federal Direct Consolidation Loan, Plaintiff had the following earned income:

| Year | Annual Amount |
|------|---------------|
| 2004 | $1,622 |
| 2005 | $1,750 |
| 2006 | $ 895 |
| 2007 | $4,499 |
| 2008 | $4,504 |
| 2009 | $ 380 |

provides that Ms. Greene is well-educated, possessing two bachelor's degrees, including one in civil engineering from The Johns Hopkins University, and has undertaken extensive graduate work and other course work.  Ms. Greene incurred a substantial amount of student loan debt that was consolidated in 2004 into the Student Loan, which provides it will be repaid under the Income Contingent Plan.  Because Ms. Greene's adjusted gross income since the Student Loan has entered repayment has always been less than the Poverty Level Guidelines established by the United States Department of Health and Human Services, her monthly payment under the Income Contingent Plan has always been and remains $0.00.  Accordingly, Ms. Greene is not in default on the payment of the Student Loan.  The Stipulation also establishes Ms. Greene has lived in an impoverished state since obtaining the Student Loan and currently owns minimal property.

## B.  Evidence at Trial

Ms. Greene was the sole witness at trial, and much of her testimony echoed the contents of the Stipulation.  Ms. Greene reaffirmed her poverty status since obtaining the Student Loan and that she has made no payments since the consolidation.  *See* Trial Transcript at 10-12 (hereinafter, "Tr.").  She lives in a house owned by her father, has an older automobile that needs repair, and she and her

---

2010    $ 565
2011    $ 280

28.  The 2012 Health and Human Services (HHS) Poverty Guidelines amount for a family of two is $15,130.00.

28.  Plaintiff owns no real property.  Plaintiff rents her residence at the rate of $600.00 per month.

29.  The trustee in Plaintiff's bankruptcy case determined her case to be a no-asset case.

Stipulation ¶¶ 1-29.

daughter, age sixteen (16), live in a relatively primitive manner without hot water accessability.  *See id.* at 13-16; *see also id.* at 36 (indicating that the current total value of her assets was approximately $2,200.00).  Ms. Greene testified she has no money to go to the doctor and last received regular medical treatment when she was a military dependent until she turned twenty-three (23) years old, some sixteen (16) years ago.  *Id.* at 16.

Ms. Greene also reiterated the portion of the Stipulation related to her education.  *See id.* at 17-19, 37-40, 42.  She traces many of her problems finding acceptable employment to a summer internship with the United States Navy in Washington, D.C. approximately sixteen (16) years ago where she asserts a supervisor raped her and she became pregnant with her daughter.  *See id.* at 20, 23-24.  She ultimately sued the Department of Navy, and her supervisor was court martialed and convicted of behavior unbecoming to an officer and a gentleman.  *See id.* at 25; Def. Exh. 121, Court Martial documents.[4]  Thereafter, her life deteriorated, as she lived in shelters and battled the supervisor for custody of her daughter.  *See* Tr. at 25.

Ms. Greene testified she suffers from an anxiety disorder, which predates the events experienced during her summer internship with the United States Navy.  *See id.* at 26.  She also asserted that she has "a lot of trouble" if she has "to have a male person within [her] body space."  *Id.* at 26-27.  She also testified she has been "kept for observation a couple of times," *id.* at 26, presumably in a hospital setting.  She has no medical records of any treatment that she has received and stated that she did not believe such records were necessary for this proceeding because she contends only that she is limited as to the type of work she can perform, not that she is unable to

---

[4] In her Reply Brief, Ms. Greene expands her trial testimony concerning the events during her internship, contending she was "physically hurt" and "paralyzed" and that she had "suicidal thoughts" that resulted in a brief hospitalization.  Reply Brief at 2.

work.  *Id*. at 27.  Since she obtained the Student Loan in 2004, Ms. Greene has had no medical treatment by any healthcare professional and is not on any medication.  *Id*. at 33, 50-51.  Ms. Greene testified that she has participated in self-help and domestic violence support groups and continues to speak with someone on an individual basis.  *See id*. at 16, 67-68.  No medical records of any kind were exhibited at trial.[5]

Ms. Greene believes her anxiety disorder severely limits her employability as she feels she is unable to work in an office where men are present.  *Id*. at 26-27.  She has not taken the "fundamentals of engineering" examination, and, complaining of being a slow learner, she does not anticipate sitting for this licensure examination any time soon.  *Id*. at 27-28; *see also id.* at 12.  She also believes her earlier lawsuit against the Department of Navy impedes her ability to obtain employment.  *Id*. at 30.  Ms. Greene is presently unemployed and has had no income during 2012.  *Id*. at 36.  She has, however, been registered with the Virginia Employment Commission since August 2009.  *Id*. at 17, 39.  Ms. Greene's most recent employment consisted of performing telemarketing work from her home and tutoring children of women she knows.  *Id*. at 19, 30, 47.  Ms. Greene does not advertise and has not informed any school district that she is available to provide tutoring services; instead, she relies on word of mouth to obtain additional tutoring jobs.

---

[5] Ms. Greene testified that it was her understanding that the military would no longer have medical records for the time period when she was a military dependent, except for hospitalization records.  Tr. at 33.  Ms. Greene filed a Motion to Continue the trial on August 17, 2012.  *See* Docket Entry 38.  Ms. Greene represented at trial that the basis for asking the Court to continue the trial was to provide her time to investigate whether any of her medical records could be obtained from the military because she had, at that point, realized that the records might be relevant to the proceeding.  Tr. at 33.  However, she did not include this reasoning in her motion, *id*. at 34, and the Court denied it.  *See* Docket Entry 40.  Ms. Greene thereafter attempted to locate her military medical records by searching through legal files in her possession related to the suit she filed against the Department of Navy but was unable to do so.  Tr. at 34.

*Id*. at 47-48.   She has applied for engineering jobs, *id*. at 40, as well as for jobs outside the engineering field, all without success.   *Id*. at 42-44.   She has also researched to some extent obtaining jobs with or working at home for women-owned businesses, *id*. at 45, but did not elaborate on these efforts.   She further expressed interest in providing child-care services or working at an all-girls school if one was located in an area to which she could travel given her limited transportation resources.   *Id*. at 45-46.   Ms. Greene indicated that she could apply for more jobs but expressed concerns regarding what type of alternate work arrangements employers would be willing to make in light of her difficulty with working in close proximity to men.   *Id*. at 27, 40.

Notwithstanding Ms. Greene's allegations in paragraphs 6 and 7 of the Amended Complaint and her testimony at trial, *see, e.g.*, Tr. at 26-27, that she suffers from anxiety disorder, Ms. Greene asserts in her Reply Brief that she "did not think she had post-traumatic stress disorder" and that "[a]s plaintiff ceased receiving professional treatment in 1996 when her insurance benefits expired, she was not in a position to provide the court with a diagnosis of anxiety disorder or to self-determine that she presently even has a mental disorder or to try to create a legal link between her inability to obtain secure or lucrative employment and her own self-diagnosis."   Reply Brief at 14. Ms. Greene further states that if permitted, she "would strike this allegation from her complaint and ask the Court to decide the case on the remaining grounds asserted by plaintiff."   *Id.*   Despite the seeming abandonment of a physical or mental condition as the "additional circumstance" supporting the discharge of the Student Loan, Ms. Greene, in arguing that she need not provide any evidence of a medical condition at trial, appears to retrench later in her Reply Brief when she asserts that "[p]lainly, plaintiff experienced devastating, life shattering consequences of working in a shared work space with a male in 1995." *Id.* at 16.

10

Ms. Greene believes that she will never be able to earn income sufficient to permit her to pay

the Student Loan in full.  Tr. at 12, 31.  Ms. Greene also expressed concern about potential tax

consequences if the Student Loan balance is forgiven at the end of its twenty-five (25) year term.

*Id*. at 31-32.  Ms. Greene additionally offered six (6) exhibits for the Court's consideration.[6]

Finally, the Court observes that Ms. Greene presented herself during the totality of the

proceedings in this matter as a very articulate, well-spoken individual.  The Court further notes that

Ms. Greene's pleadings, including her twenty-four (24) page Brief and thirty-two (32) page Reply

Brief, are extremely well-drafted, particularly for an unrepresented litigant.

The United States introduced no evidence other than its admitted exhibits.[7]  It remains to

---

[6] The following exhibits were offered by Ms. Greene and admitted into evidence at trial.
Exhibit 1 is an excerpt from a United States Census Bureau publication entitled "How the
Census Bureau Measures Poverty."  Exhibit 2 is an excerpt from Ms. Greene's Social Security
Earnings Record.  Exhibit 3 is a loan repayment calculation.  Exhibit 4 is a description of
repayment plans offered by the United States Department of Education.  Exhibit 5 is a detailed
description of the Income-Based Repayment Plan offered by the United States Department of
Education.  Finally, Exhibit 6 is an excerpt from an Internal Revenue Service publication entitled
"Student Loan Cancellations and Repayment Assistance," which was admitted over the objection
of the United States.

[7] The following exhibits were offered by the United States and admitted into evidence at
trial.  Exhibit 101 is the Amended Complaint to Determine the Dischargeability of Student Loan
filed in this adversary proceeding.  Exhibit 102 is the United States' Answer to the Amended
Complaint.  Exhibit 103 is the United States' First Set of Interrogatories to Ms. Greene.  Exhibit
104 is Ms. Greene's Response to the United States' First Set of Interrogatories.  Exhibit 105 is
Ms. Greene's Schedules and Statement of Financial Affairs filed in her bankruptcy case.  Exhibit
106 is a Disbursement Statement regarding a support payment received by Ms. Greene.  Exhibit
107 is a Supplemental Nutrition Assistance Program (SNAP) Notice of Action.  Exhibit 108 is
Ms. Greene's 2010 federal income tax return.  Exhibit 109 is an excerpt from Ms. Greene's
Social Security Earnings Record (which exhibit duplicates Ms. Greene's Exhibit 2).  Exhibit 110
is a Federal Direct Consolidation Loan Electronic Note dated October 12, 2004.  Exhibit 111 is a
Certificate of Indebtedness dated September 21, 2011, issued by the United States Department of
Education.  Exhibit 112 is a Payment History Itemization.  Exhibit 113 is a Borrower History
and Activity Report.  Exhibit 114 is a blank Form 1040 federal tax return for 2011.  Exhibit 115
is the 2011 Internal Revenue Service tax table.  Exhibit 116 is the 2012 Department of Health

conclude whether Ms. Greene has proven her entitlement to a discharge of the Student Loan under

11 U.S.C. § 523(a)(8).[8]

### III.  Conclusions of Law

### A.  The Law of the Fourth Circuit

The Bankruptcy Code permits the discharge of a student loan only upon a showing that

repayment of the loan will create an "undue hardship" upon the debtor and her dependents.  11

U.S.C. § 523(a)(8).  However, the term "undue hardship" is undefined in the Bankruptcy Code.  The

Fourth Circuit Court of Appeals has previously considered the intended meaning of "undue

hardship."

> A debtor seeking to discharge government-guaranteed educational loans . . . faces a difficult burden, because she must show that not discharging the debt would impose an undue hardship.  Congress, however, neither defined "undue hardship" nor provided standards for what it entails.  *See O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003).

> Nonetheless, the ordinary meaning of "undue" gives us clear guidance. "Undue" generally means "unwarranted" or "excessive."  *See The Random House Dictionary of the English Language* 2066 (2d ed. 1987).  Because Congress selected the word "undue," the required hardship under § 523(a)(8) must be more than the usual hardship that accompanies bankruptcy.  Inability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue hardship.

---

and Human Services Poverty Guidelines for 2012.  Exhibit 117 are loan repayment calculations. Exhibit 118 is Ms. Greene's Response to the United States' Second Set of Interrogatories and Second Request for Production of Documents.  Exhibit 119 is the opinion rendered in the case of *Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999), which was admitted over Ms. Greene's objection.  Finally, Exhibit 121 consists of Court Martial documents, which exhibit was also admitted over Ms. Greene's objection.  The Court sustained Ms. Greene's objection to Exhibit 120 of the United States, and the exhibit was withdrawn by counsel for the United States.

[8] At the conclusion of Ms. Greene's evidence, the United States moved for judgment on partial findings pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  Tr. at 53. In accordance with the provisions of Rule 7052, the Court declined to render any judgment until the close of the evidence and submission of post-trial papers by the parties.  *Id*. at 66.

> The exception would swallow the rule, and Congress's restriction would be meaningless. As a result, "[t]he existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans." *Rifino v. United States* (*In re Rifino*), 245 F.3d 1083, 1087 (9th Cir. 2001) (internal quotation marks omitted).

*Educ. Credit Mgmt. Corp. v. Frushour* (*In re Frushour*), 433 F.3d 393, 399 (4th Cir. 2005) (hereinafter "*Frushour*"). This Court has previously summarized the requirements in this circuit relating to the discharge of student loans:

> The Fourth Circuit Court of Appeals has adopted the three-part test articulated in the decision of *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). *Educ. Credit Mgmt. Corp. v. Frushour* (*In re Frushour*), 433 F.3d 393, 400-01 (4th Cir. 2005) (adopting the *Brunner* test for determining dischargeability of student loans in cases filed under Chapter 7); *Ekenasi v. Educ. Res. Inst.* (*In re Ekenasi*), 325 F.3d 541, 546 (4th Cir. 2003) (adopting the *Brunner* test for determining dischargeability of student loans in cases filed under Chapter 13). Thus, in order to discharge a government-guaranteed student loan, a debtor "must establish (1) that he cannot maintain a minimal standard of living for himself and his dependents, based on his current income and expenses, if he is required to repay the student loans; (2) that additional circumstances indicate that his inability to do so is likely to exist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans." *In re Ekenasi*, 325 F.3d at 546 (quoting *Brunner*, 831 F.2d at 396).

*Burton v. Educ. Credit Mgmt. Corp.* (*In re Burton*), 339 B.R. 856, 869 (Bankr. E.D. Va. 2006) (hereinafter "*Burton*"). The debtor must prove all three *Brunner* factors by a preponderance of the evidence. *Frushour*, 433 F.3d at 400. This Court has also addressed the extent of the showing required for a debtor to be relieved of a student loan:

> "Generally speaking, the legislative history of Section 523(a)(8) suggests a finding of undue hardship is an exception to the rule, and it must mean more than unpleasantness associated with repayment of a just debt." *Jones v. Nat'l Payment Ctr.* (*In re Jones*), 242 B.R. 321, 325 (Bankr. E.D. Va. 1998), *aff'd in part and remanded on other grounds sub nom. Educ. Credit Mgmt. Corp. v. Jones*, No. 3:99CV258, 1999 WL 1211797 (E.D. Va. July 14, 1999). As the Fourth Circuit Court of Appeals has recently stated, "[i]nability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue hardship." *In re Frushour*, 433 F.3d at 399-400.

13

"Each undue hardship discharge must rest on its own facts, but dischargeability of student loans should be based on a 'certainty of hopelessness.'" *In re Jones*, 242 B.R. at 325 (quoting *Lezer v. New York State Higher Educ. Servs. Corp.* (*In re Lezer*), 21 B.R. 783, 789 (Bankr. N.D.N.Y. 1982)).  In order to discharge a student loan, a debtor "must show that the unique or extraordinary circumstances which created the hardship render it unlikely that the debtor will ever be able to honor [his] obligations." *Id.* (citing *Love v. U.S.* (*In re Love*), 33 B.R. 753, 754-55 (Bankr. E.D. Va. 1983)).

*Burton*, 339 B.R. at 870.  "'Moreover, this test must be strictly construed: equitable concerns or other extraneous factors not contemplated by the test may not be imported into the analysis of undue hardship.'"  *Carter v. Pennsylvania* (*In re Carter*), 295 B.R. 555, 559 (Bankr. W.D. Pa. 2003) (quoting *Brightful v. Pa. Higher Educ. Assistance Agency* (*In re Brightful*), 267 F.3d 324, 328 (3d Cir. 2001)).  Accordingly, the Court must assess the evidence presented at trial to determine if Ms. Greene has proven by a preponderance of the evidence that repayment of the Student Loan owed to the United States will constitute an undue hardship.

B.  Can Ms. Greene Maintain a Minimal Standard of Living?

In *Burton*, this Court considered the requirements of the first prong of the *Brunner* test:

The initial prong of the *Brunner* inquiry requires this Court to assess whether the debtor has proven he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the student loans.  *In re Ekenasi*, 325 F.3d at 546 (citing *Brunner*, 831 F.2d at 396).  In making this assessment, "a court should examine the debtor's standard of living, with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents."  *U.S. Dep't of Health & Human Servs. v. Smitley* (*In re Smitley*), 347 F.3d 109, 117 (4th Cir. 2003) (citing *In re Ekenasi*, 325 F.3d at 546; *Rice v. U.S.* (*In re Rice*), 78 F.3d 1144, 1149 (6th Cir. 1996)).  In contemplation of what constitutes a "minimal standard of living," some courts have equated poverty with such a standard.  *McCormack v. Educ. Credit Mgmt. Corp.* (*In re McCormack*), No. 99-10637, 2000 WL 33710278, at *4 (Bankr. D.S.C. July 3, 2000) (citing *Griffin v. Eduserv* (*In re Griffin*), 197 B.R. 144, 147 (Bankr. E.D. Okla. 1996)).  Other courts have not required that debtors live in poverty in order to satisfy the first *Brunner* prong, instead taking into consideration the debtor's current income and expenses in determining whether the debtor and her dependents, if any, will be able to sustain a "minimal" standard of living.  *Id.* (citing *Ammirati v. Nellie Mae,*

14

> *Inc.* (*In re Ammirati*), 187 B.R. 902, 907 (D.S.C. 1995), *aff'd* 85 F.3d 615 (4th Cir.
> 1996)).  Specifically, "[t]he bankruptcy court must determine what amount is
> minimally necessary to ensure that the debtor's needs for care, including food,
> shelter, clothing, and medical treatment are met."  *Salinas v. United Student Aid
> Funds, Inc.* (*In re Salinas*), 240 B.R. 305, 314 (Bankr. W.D. Wis. 1999) (citing *In re
> Rice*, 78 F.3d at 1149).  "Once that determination is made, the question is whether
> the debtor has additional funds with which to make payments toward [the debtor's]
> student loans." *Id.*

*Burton*, 339 B.R. at 870-71.  Often, courts must undertake extensive analysis to determine whether

a debtor has minimized her living expenses; here, however, the evidence here unquestionably shows

Ms. Greene has done so for some time.  She lives meagerly and does not have a number of items and

services that most individuals would deem essential, such as the availability of hot water at her

residence.  Ms. Greene asserts that her income is below the poverty guidelines and that her expenses

exceed her income.  Ms. Greene and the United States have stipulated that the poverty guidelines

for a family of two (2) is an annual income below $15,130.00, Stipulation ¶ 28, and that Ms.

Greene's adjusted gross income since the loan entered repayment has been less than the Poverty

Level Guidelines, *id.* ¶ 20.

Having satisfied the initial inquiry that Ms. Greene and her dependent maintain a minimal

standard of living, the focus of the first *Brunner* prong typically shifts to whether the debtor has

additional funds with which she can make her student loan payment.  Ms. Greene's circumstances,

however, present a somewhat unique analysis.  Ms. Greene has already consolidated her student

loans, was accepted into and presently participates in the Income Contingent Plan under the William

D. Ford Direct Loan Program pursuant to Title IV, Part D of the Higher Education Act of 1965, as

amended.  *Id.*  ¶¶ 9-12, 20.  Most notably, the United States fixed the monthly payment on the

Student Loan at $0.00 for a maximum repayment period of 25 years, with the payment amount

subject to annual adjustments for changes in Ms. Greene's adjusted gross income as reflected on her

filed federal income tax returns or in her earned income as reflected on Alternative Documentation

of Income forms, without regard to child support or welfare benefits. *Id.* ¶ 13. Accordingly, Ms.

Greene's monthly payments on the Student Loan are and will remain zero unless and until her

annual income increases. *Id.* ¶¶ 20-21. In consideration of these facts, the United States argues that

Ms. Greene cannot carry her burden on the first *Brunner* prong because her payment is zero, and,

therefore, her ability to maintain a minimal standard of living is not affected by the loan payment,

or perhaps more appropriately, the lack thereof. United States Response at 12. The Court must

therefore determine whether Ms. Greene's current ability to maintain her minimal lifestyle in light

of her zero monthly payment on the Student Loan prevents the conclusion that she has satisfied the

first *Brunner* inquiry.

The effect of the Income Contingent Plan on the determination of the dischargeability of a

student loan has been analyzed in a number of decisions but rarely is it considered in the context of

the first *Brunner* prong. Instead, a debtor's participation, or failure to do so, in the Income

Contingent Plan is most often discussed in the context of whether that debtor has satisfied the third

*Brunner* prong, which requires a debtor to show that she has tried in good faith to repay the student

loan. The Fourth Circuit Court of Appeals considered the effect of participation in the Income

Contingent Plan at length in *Frushour* in the context of the third *Brunner* element:

> The debtor's effort to seek out loan consolidation options that make the debt
> less onerous is an important component of the good-faith inquiry. *See Alderete v.
> Educ. Credit Mgmt. Corp.* (*In re Alderete*), 412 F.3d 1200, 1206 (10th Cir. 2005).
> Although not always dispositive, it illustrates that the debtor takes her loan
> obligations seriously, and is doing her utmost to repay them despite her unfortunate
> circumstances. *See Tirch*, 409 F.3d at 682-83; *see also Smitley*, 347 F.3d at 121-22,
> 124 (relying in part on fact that debtor was eligible for income contingent repayment
> plan to deny discharge under "unconscionable" standard for Health Education
> Assistance Loans).

> Frushour has not shown the requisite effort to repay her loans. To be sure,
> she should be commended for making several payments in the past. But she did not
> seriously consider the income contingent plan under the William D. Ford Direct
> Loan Program. *See Tirch*, 409 F.3d at 682-83 (debtor did not illustrate good faith
> when she did not take advantage of the William D. Ford Income Contingent
> Repayment plan); *see also Alderete*, 412 F.3d at 1206 & n.1 (debtors did not prove
> good faith when they did not consider applying for the income contingent plan, even
> though the court was not certain they were even eligible for the plan). Both parties
> agree that Frushour could have taken advantage of this plan, and ECMC has
> provided assurances that she continues to remain eligible. The plan would have
> allowed her to pay between zero and five dollars per month unless her income
> increased. After twenty-five years, any remaining debt would be discharged. *See*
> 34 C.F.R. § 685.209.
>
> Frushour's only reasons for refusing that option, however, were that it was
> not suited for her and she wanted a fresh start. It is hard to see why these reasons are
> not simply shorthand for her lack of interest in repaying her debt. The consolidation
> plan would allow her both to remain at her preferred job and to maintain her current
> level of expenditures. Accounting for these considerations, Frushour has provided
> insufficient justifications for refusing to take a simple step that would have allowed
> her to fulfill her commitments in a manageable way. *See, e.g.*, *Tirch*, 409 F.3d at
> 683. She has thus failed to satisfy the third *Brunner* factor of manifest good-faith
> effort to repay her loans.

*Frushour*, 433 F.3d at 402-03; *accord Vargas v. Educ. Credit Mgmt. Corp.* (*In re Vargas*), Civil No.

10-4022, 2010 WL 5395142, at *5 (C.D. Ill. Dec. 22, 2010) (unreported decision) (concluding that

the debtor did not demonstrate a good faith effort to repay when he "did not explore, much less take

advantage of, one of the alternative repayment plans available to him even when able to do so").

The Court's consideration at this stage requires examination not of the good faith of a debtor

who does not enter the Income Contingent Plan, but, instead, whether a debtor who is participating

in the Income Contingent Plan and presently has a zero monthly payment thereunder is necessarily

precluded from satisfying the first *Brunner* prong. That prong of the *Brunner* inquiry, as set forth

above, requires the Court to determine whether the debtor has proven she cannot maintain, based

on current income and expenses, a minimal standard of living for herself and her dependents if

forced to repay the student loans.  In other words, where a debtor's prescribed monthly payment on a student loan is zero, the Court must determine whether the debtor could *ever* show that she *cannot* maintain a minimal standard of living if the student loan debt is not discharged.[9]

Few decisions have considered a circumstance like the one Ms. Greene faces.  In analyzing the first *Brunner* prong in *United States Department of Education v. Geyer* (*In re Geyer*), 344 B.R. 129 (S.D. Cal. 2006), the district court concluded that the debtors' participation in the Income Contingent Plan precluded a finding that the debtors could not maintain a minimal standard of living if the student loans were not excepted from discharge:

> Mrs. Geyer is 63 and Mr. Geyer is 52 years old.  They are in good health and have no dependents.  Mrs. Geyer's student loans are the only debt remaining.  She consolidated her student loans and elected to repay them under the Income Contingent Repayment Plan, which sets the payments based on the borrower's income.  If the income falls below a certain level, no monthly payment is due.  Under this plan, based on Debtor's income, Mrs. Geyer's current monthly payment is zero.  A borrower whose monthly payment is zero is considered current, and there is no adverse credit reporting to the credit bureaus.  The maximum repayment period under this plan is 25 years.  Any portion of the loan at the end of this period is discharged, although the discharged amount may be considered taxable income. (RA at 42-55.)

> The foregoing facts to [*sic*] do not raise a genuine issue of material fact regarding undue hardship.  Excluding the student loans from discharge does not impose any hardship on Debtors, since, by virtue of the Income Contingent Repayment Plan, they are not required to make any payments at all.  Accordingly, they cannot show that they cannot maintain a minimal standard of living if the loans are not discharged.  *See Rifino*, 245 F.3d at 1087.  For the same reason, they cannot

---

[9] One court recommends that a debtor's circumstances first be assessed under the *Brunner* factors, and, if the debtor satisfies the *Brunner* factors, the court then considers the effects of the William D. Ford Program upon the debtor.  *Bene v. Educ. Credit Mgmt. Corp.* (*In re Bene*), 474 B.R. 56, 75 (Bankr. W.D.N.Y. 2012).  There is no authority in the Fourth Circuit requiring the application of any factors beyond those set forth in *Brunner* to determine if a student loan debt should be discharged.  *Frushour*, 433 F.3d at 400-01 (adopting the *Brunner* test for determining dischargeability of student loans in cases filed under Chapter 7); *Ekenasi v. Educ. Res. Inst.* (*In re Ekenasi*), 325 F.3d 541, 546 (4th Cir. 2003) (adopting the *Brunner* test for determining dischargeability of student loans in cases filed under Chapter 13).

show that the loans would preclude them from maintaining a minimal standard of living for a significant portion of the remaining repayment period.  *See id.*

*U.S. Dep't of Educ. v. Geyer* (*In re Geyer*), 344 B.R. 129, 132-33 (S.D. Cal. 2006).[10]

This issue also was considered by the court in *Booth v. United States Department of Education* (*In re Booth*), 410 B.R. 672 (Bankr. E.D. Wash. 2009).  There, the debtor commenced an adversary proceeding seeking a discharge of her student loan obligations of approximately $160,000.00.  *Booth v. U.S. Dep't of Educ.* (*In re Booth*), 410 B.R. 672, 673 (Bankr. E.D. Wash. 2009).  Prior to commencing her Chapter 7 case, the debtor had participated in the Income Contingent Plan.  *Id.*  The defendants (the United States Department of Education; the Washington Student Loan Finance Association; ACS, Inc.; and Educational Credit Management Corporation) filed a joint Motion for Summary Judgment seeking a determination that if participation in the Income Contingent Plan results in a monthly payment of zero, then, as a matter of law, the "undue hardship" showing required by 11 U.S.C. § 523(a)(8) does not exist.  *In re Booth*, 410 B.R. at 673-

---

[10] Ms. Greene attempts to distinguish *Geyer* in her Brief by contending the court there relied upon the fact that the Geyers, unlike Ms. Greene, "had substantial earned income at least intermittently and had had the apparent capacity to earn substantial income in the future."  Brief at 7.  The *Geyer* court appears to have considered these facts not as part of the first *Brunner* prong but as part of the second *Brunner* prong, which examines whether any additional circumstances exist indicating that a debtor's inability to repay student loans is likely to exist for a significant portion of the repayment period:

> In the alternative, assuming *arguendo* that Debtors had to make loan payments at a level greater than zero, their history and background shows they are capable of earning more than they spend, and that their state of affairs need not persist in the future. . . . They were able to earn more in the recent past. . . .  Increasing Debtors' current level of income is not out of their control.

*In re Geyer*, 344 B.R. at 133.  The *Geyer* court plainly found that the debtors, with their present student loan payment of zero, could not prove that excluding their student loans from discharge would prevent maintenance of a minimal standard of living at that time or that circumstances existed that precluded earning higher incomes in the future.  *Id.*

74. The court rejected this proposition:

> Unlike undue hardship which requires a case-by-case analysis, application of [the Income Contingent Plan] is determined by a formula. Application of [the Income Contingent Plan] is an administrative procedure subject to the administrative rule-making process. Calculations under the formula, such as percentage of adjusted gross income, may change on an annual basis. Application of [the Income Contingent Plan] and the determination of the appropriate monthly payment repeats on an annual basis for as long as 25 years. In contrast with the Bankruptcy Code's determination of an ability to repay, the formulaic administrative process does not consider the reasonableness of a debtor's expenses nor the ability to maximize income. Thus, issues required to be addressed under the first prong of the *Brunner* test, are not considered in the administrative process.

> A debtor's participation in [the Income Contingent Plan] is relevant to much of the analysis conducted by a bankruptcy court to determine if undue hardship exists. However, this current motion is limited to determining as a matter of law, if a zero monthly payment plan under [the Income Contingent Plan] prevents a debtor from demonstrating an inability, based on current circumstances, to repay a student loan obligation. Granting this motion would replace a court's conclusion regarding permanent relief from the underlying obligation with an administrative agency conclusion that repayment of a debt should be deferred. Terrence L. Michael & Janie M. Phelps, *Judges?!—We Don't Need No Stinking Judges!!!: The Discharge of Student Loans In Bankruptcy Cases And The Income Contingent Repayment Plan*, 38 Tex. Tech L. Rev. 73 (2005).

> Holding that an administrative decision to temporarily defer monthly repayments precludes application of the statutory undue hardship standards usurps the Bankruptcy Code. It destroys the jurisdiction of the bankruptcy court and would not allow any exercise of discretion by a bankruptcy judge. Granting the defendants' motion would effectively replace a statutory case-by-case analysis potentially relieving a debtor from liability with an administrative formula which potentially defers liability.

*Id*. at 676-77. *See also Coatney v. U.S. Dep't of Educ.* (*In re Coatney*), 345 B.R. 905, 909 (Bankr. C.D. Ill. 2006) ("The United States argues that the Debtor cannot establish any present financial hardship because his payments are zero under the [the Income Contingent Plan]. That is not the *Roberson* test. The test is whether the Debtor's current financial condition precludes him from maintaining a minimal standard of living *if* forced to repay his student loan. This question can only

be answered in the affirmative.").[11]

The United States argues that the result in *Booth* fails to consider specific language within the first *Brunner* prong as adopted in this circuit: "that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents *if forced to repay the loans.*" *Frushour*, 433 F.3d at 400 (quoting *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)) (emphasis added). Here, because Ms. Greene's monthly payments are zero, the United States contends that she is not being *forced* to *repay* the Student Loan. United States Response at 14-15. The United States argues this Court must give meaning to the phrase "if forced to repay the loans" such that if a debtor is not forced to make a monthly payment in an amount greater than zero, then the debtor's ability to maintain a minimal standard of living is not affected by the student loan obligation, thus precluding the debtor from satisfying the first *Brunner* prong. *Id*. In her Reply Brief, Ms. Greene counters this argument by asserting that the language cited by the United States requires the Court to consider "the result if the debtor were forced to make actual tendered payments to repay the student loan." Reply Brief at 4.

This Court concludes that a debtor's participation in the Income Contingent Plan does not serve as a substitute for the analysis of a debtor's financial situation applying the *Brunner* factors.[12]

---

[11] The Seventh Circuit Court of Appeals adopted the *Brunner* test in *Roberson*. *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993).

[12] In its analysis of the legislative history of William D. Ford Program, the Eighth Circuit Court of Appeals suggests that it was the intent of Congress that such loans would be subject to the discharge provisions of Section 523(a)(8):

> When the size of the debts is the principal basis for a claim of undue hardship, the generous repayment plans Congress authorized the Secretary of Education to design and offer under the William D. Ford Federal Direct Student Loan Program become more relevant to a totality-of-the-circumstances undue hardship analysis. *See* Student Loan Reform Act of 1993, Pub. L. No. 103-66, tit.

*Todd v. Access Group, Inc.* (*In re Todd*), 473 B.R. 676, 694 (Bankr. D. Md. 2012) (citing 4 Collier on Bankruptcy, ¶ 523.14[2] (16th ed. 2012)) ("Section 523(a)(8) allows debtors to discharge their student loans upon a showing that repaying them would be an 'undue hardship.' There is no indication that Congress intended to supplant this unambiguous directive with the Ford Program and its existence should not be treated as an implicit repeal of Section 523(a)(8)."). The Income Contingent Plan, as other courts have well-noted, does not constitute a "fourth prong" of the *Brunner* analysis. The Court agrees with Ms. Greene's argument in her Brief that participation or eligibility to participate in the Income Contingent Plan should not constitute a *per se* rule precluding discharge of student loans under Section 523(a)(8). *See* Brief at 5-7. However, as the Fourth Circuit Court

---

IV, § 4021, 107 Stat. 312, 341, codified at 20 U.S.C. § 1087e(d); 34 C.F.R. § 685.208. The most generous plan is the Income Contingent Repayment Plan ("ICRP"), which permits an eligible borrower to make "varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." § 1087e(d)(1)(D); *see* 34 C.F.R. § 685.209. Though the House and Senate bills initially provided that loans issued under the Direct Student Loan Program would not be dischargeable, the House Conference Report explained why this provision was deleted from the final bill:

> The conferees believe that current provisions of the Bankruptcy Code are sufficient to protect against unnecessary discharge of direct student loans in bankruptcy. Section 523(a)(8) of the Bankruptcy Code operates to prevent the discharge of federally guaranteed education loans except in cases . . . where failure to allow the discharge would impose an undue hardship. . . . It is the intent of the conferees that loans made pursuant to the Federal Direct Student Loan Program would be subject to these same limitations on discharge.

H.R. Conf. Rep. No. 103-213, at 448-49 (1993), reprinted in 1993 U.S.C.C.A.N. 1088, 1137-38. Thus, undue hardship under § 523(a)(8) continues to require separate analysis . . . .

*Educ. Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 780-81 (8th Cir. 2009).

of Appeals taught in *Frushour*, the existence of and opportunity to participate in the Income

Contingent Plan is properly considered as a factual circumstance in the application of the *Brunner*

test to a given debtor's case.  *See Frushour*, 433 F.3d at 404.

 The first prong of the *Brunner* test demands assessment of whether a debtor has proven "he

cannot maintain a minimal standard of living for himself and his dependents, based upon his current

income and expenses, if forced to repay the student loans." *Ekenasi v. Educ. Res. Inst.* (*In re

Ekenasi*), 325 F.3d 541, 546 (4th Cir. 2003) (citing *Brunner*, 831 F.2d at 396).  Two observations

flow from this language.  First, this prong of *Brunner* contemplates an evaluation of the *present*

impact repayment of the subject student loan has upon the standard of living of the debtor and the

debtor's dependents in light of the debtor's *current* income and expenses.  Thus, the fact that the

prescribed payments on the student loan may change under the Income Contingent Plan in certain

circumstances in the future logically should be evaluated in the forward-looking second prong of

the *Brunner* test.[13]  Second, the analysis demanded by the first *Brunner* prong must consider the

effect on the debtor and her dependents "*if forced to repay the student loans.*"  Presently, Ms.

---

 [13] In a recent student loan dischargeability case, the United States Department of
Education argued that the debtor there could maintain a minimal standard of living because he
was eligible for either the Income Contingent Plan or the Income Based Repayment Plan and,
under either plan, his prescribed payment *would be* zero.  *Braun v. Sallie Mae* (*In re Braun*),
Adv. No. 11-01529, 2012 WL 5199163, at *6 (Bankr. E.D. Va. Oct. 19, 2012) (unpublished
decision).  No such factual assumption needs to be made in the instant matter, as Ms. Greene *is
currently* participating in the Income Contingent Plan and has done so since obtaining the
Student Loan in 2004.  Stipulation ¶¶ 9-12.  Thus, the Court's consideration of Ms. Greene's
*current* contractual monthly payment of zero under that repayment plan is not only proper, but
necessary, as the first *Brunner* prong requires examination of the debtor's *current* monthly
student loan payment, *not* a hypothetical amount.  *Brunner v. N.Y. State Higher Educ. Servs.
Corp.* (*In re Brunner*), 46 B.R. 752, 754 (S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2d Cir. 1987)
("[B]efore receiving a discharge of student loans the debtor is required to demonstrate that, given
his or her *current* income and expenses, the necessity of making *the monthly loan payment* will
cause his or her standard of living to fall below a 'minimal' level.") (emphasis added).

Greene is obligated and in repayment status on the Student Loan, with her prescribed zero monthly payment being determined by virtue of her acceptance into and participation in the Income Contingent Plan. Stipulation ¶¶ 9-12. The fact that Ms. Greene's required contractual payment amount is zero does not forestall expiration of the twenty-five (25) year repayment term, at which time the loan balance will be forgiven. *See id.* ¶¶ 13, 19. While the effect may be the same, the Income Contingent Plan cannot be equated with the granting of a deferment or forebearance, where a student loan is not in repayment status and no monthly payment of any amount is calculated. *See Educ. Credit Mgmt. Corp. v. Mosko* (*In re Mosko*), 515 F.3d 319, 326-27 (4th Cir. 2008) (discussing the failure of the debtors there to make any reasonable efforts to make payments on the student loan following the receipt of deferments and forebearances).[14]

_____

[14] At least one other court has construed the language of the first *Brunner* prong somewhat differently, finding a debtor, who was participating in the Income Contingent Plan and was not required thereunder to make any payments on the student loan, would be forced to live in an impoverished state if hypothetically required to make a payment on the loans. *Coatney v. U.S. Dep't of Educ.* (*In re Coatney*), 345 B.R. 905, 908 (Bankr. C.D. Ill. 2006). The court concluded:

> The test is whether the Debtor's current financial condition precludes him from maintaining a minimal standard of living *if* forced to repay his student loan. This question can only be answered in the affirmative. If forced to repay the student loan, this Debtor and his family would not be able to maintain a minimal standard of living. The [Income Contingent Plan]'s current determination that no payments are due according to its program guidelines is not a substitute for this Court's analysis of what the Debtor's situation would be if he had to make payments on his student loans.

*Id.* at 909-10 (citing *Durrani v. Educ. Credit Mgmt. Corp.* (*In re Durrani*), 311 B.R. 496, 506-07 (Bankr. N.D. Ill. 2004)). The requirements of the *Brunner* test, as adopted in the Fourth Circuit, however, are to be strictly construed, and "equitable concerns or other extraneous factors not included within its framework may not be considered by the Court in its dischargeability analysis." *Marcotte v. Brazos Higher Educ. Serv. Corp.* (*In re Marcotte*), 455 B.R. 460, 467 (Bankr. D.S.C. 2011) (citing *Pa. Higher Educ. Assistance Agency v. Faish* (*In re Faish*), 72 F.3d 298, 306 (3d Cir. 1995); *Straub v. Sallie Mae* (*In re Straub*), 435 B.R. 312, 317 (Bankr. D.S.C. 2010)).

While mindful of the sage advice not to assume participation in the Income Contingent Plan *ipso facto* prevents satisfaction of the *Brunner* test, it appears equally inappropriate to ignore the present fact that the repayment of Ms. Greene's Student Loan has no effect whatsoever on her ability to maintain a minimal standard of living for herself and her dependent.[15]  In other words, in light of the present circumstances, denying the discharge of Ms. Greene's Student Loan, with its prescribed monthly zero payment, would not cause Ms. Greene to be unable to maintain a minimal standard of living.  As Judge Mitchell commented in the context of a Chapter 13 debtor who declined to pursue the Income Contingent Plan, which would have resulted in a prescribed student loan payment of zero, it is illogical to conclude that a payment of zero could be an undue hardship:  "The debtor's justification in refusing the [Income Contingent Plan] loan repayment program is not that the monthly payments of zero would pose a hardship (which indeed it could not) . . . ."  *Robinson v. Educ. Credit Mgmt. Corp.* (*In re Robinson*), 416 B.R. 275, 282 (Bankr. E.D. Va. 2009).[16]

In the context of the first *Brunner* prong, Ms. Greene also raises the issue of potential tax consequences if the Student Loan is forgiven under the Income Contingent Plan, contending that the

---

[15] It is appropriate to remember that the circumstances of each debtor must be analyzed under the *Brunner* factors.  *See King v. Vt. Student Assistance Corp.* (*In re King*), 368 B.R. 358, 367 (Bankr. D. Vt. 2007) (citing *Maulin v. Sallie Mae* (*In re Maulin*), 190 B.R. 153, 156 (Bankr. W.D.N.Y. 1995)) ("The determination of undue hardship is case- and fact-specific.").

[16] One of the decisions cited by Ms. Greene in her Brief found that a failure to enter the Income Contingent Plan was not an indicia of bad faith under the third *Brunner* prong where the debtor could not afford the payment under the Income Contingent Plan payment.  *Cota v. U.S. Dep't of Educ.* (*In re Cota*), 298 B.R. 408, 421 (Bankr. D. Ariz. 2003) ("The interactive loan calculator indicates that under the [Income Contingent Plan] guidelines, taking into account the Debtors' 2002 adjusted gross income and a family of 10, would require Mr. Cota to make payments of $78.73 for 145 months.  Based on the Debtors' current income and expenses, it is clear that Mr. Cota could not make payments of even half that amount.").  Here, where Ms. Greene's payment under the Income Contingent Plan is zero, no such circumstances of hardship are evident.

25

amount forgiven would be treated as taxable income at the end of the twenty-five (25) year term of

the Student Loan.  Brief at 10.  In contrast, the United States asserts that if the Student Loan was

written off by the Department of Education under current tax laws, Ms. Greene would realize no tax

consequences from this action pursuant to the insolvency exception.  United States Response at 34

(referencing 26 U.S.C. § 108(a)(1)(B)).  Under the insolvency exception, the United States argues,

Ms. Greene would only realize income from the cancelled debt to the extent the value of her assets

exceeded her liabilities.  *Id.* at 32 (citing 26 U.S.C. § 108(a)(1)(B)) ("Whether a taxpayer is

insolvent, and the extent of insolvency, is determined by reference to the taxpayer's assets and

liabilities immediately before the discharge of debt.").  The United States further argues that

consideration of the potential tax consequences were the Department of Education to cancel the debt

attributable to the Student Loan at the end of the twenty-five (25) year period is too speculative.  *Id.*

Some courts have cited the possible tax consequences to a debtor who participates in the

Income Contingent Plan and ultimately receives cancellation of the student loan balance as a basis

for finding that a debtor's failure to so participate precludes a finding of lack of good faith.  *See, e.g.*,

*In re Todd*, 473 B.R. at 695 n.28 ("Participation in the Ford Program could also have serious tax

consequences for Ms. Todd that would negate the program's superficial solution." ).  This Court has

previously found the possible future tax consequences of the Income Contingent Plan were too

speculative to negate its otherwise obvious benefits:

> While Burton might never have to make a payment in the 25-year period,
> there is a potential tax liability on any amount of the loan forgiven after 25 years.
> The Income Contingent Repayment Plan provides, "[i]f a borrower has not repaid a
> loan in full at the end of the 25-year repayment period . . . the Secretary cancels the
> unpaid portion of the loan."  34 C.F.R. § 685 (2005).  While the potential for tax
> implications were not raised by either party, at least one debtor has argued that the
> "Income Contingent Repayment Plan offers only false hope because . . . any
> forgiveness of the remaining debt in 25 years will be a taxable event, imposing a

high tax liability." *Educ. Credit Mgmt. Corp. v. Stanley* (*In re Stanley*), 300 B.R.
813, 818 n.8 (N.D. Fla. 2003).   However, the court in that case found that
"[f]orecasting such a tax liability under whatever tax laws will be in effect in 25
years would be shear speculation.  Forecasting the effect any such liability would
have on [the debtor's] actual standard of living at that time would be even more
speculative." *Id.*

> Therefore, while some courts, as noted in *In re Stanley*, have "referred to this
> potential tax liability as a factor in allowing discharge of student debts," this Court
> concurs that such an analysis would be speculative.  *Id.* (citing *Pennsylvania Higher
> Educ. Assistance Agency v. Birrane* (*In re Birrane*), 287 B.R. 490, 500 n.2 (B.A.P.
> 9th Cir. 2002); *Gregoryk v. United States* (*In re Gregoryk*), No. 00-31050, 2001 WL
> 1891469 (Bankr. D.N.D. Mar. 30, 2001) (unpublished opinion); *Thomsen v. Dep't
> of Educ.* (*In re Thomsen*), 234 B.R. 506, 506 (Bankr. D. Mont. 1999)).

*Burton*, 339 B.R. at 889 n.48; *accord Nielsen v. ACS, Inc.* (*In re Nielsen*), 473 B.R. 755, 762 (B.A.P.

8th Cir. 2012) ("[A]s the bankruptcy court noted, '[t]he mere possibility of tax consequences at the

expiration of the 25-year repayment' period is not dispositive of the issue of whether the [Income

Contingent Plan] represents a viable avenue for repayment of student loan debt.' We agree."); *see*

*also Educ. Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 782 (8th Cir. 2009) (citing 26 U.S.C. §

108(a)(1)(B)) ("[T]he court's reference to 'a potentially significant tax bill' when any unpaid

balance is cancelled after twenty-five years ignored the fact that cancellation results in taxable

income only if the borrower has assets exceeding the amount of debt being cancelled.").  Ms.

Greene's circumstances likewise present the Court with a situation where the potential tax

implications are too speculative to influence the determination of dischargeability of the Student

Loan.

> In further support of her argument that she cannot presently maintain a minimal standard of

living, Ms. Greene asserts that her participation in the Income Contingent Plan is unsatisfactory in

the long term because her current payment of zero causes the Student Loan to accrue interest, thus

inflating the balance and making it impossible to pay even if she is successful in obtaining more

lucrative employment.[17]  Ms. Greene asserts that, to pay the accruing interest on the Student Loan,

she would have to obtain employment at an annual salary of $60,000.00.  Brief at 8-10; *see also id.*

at 16, 20-21 (discussing the amount of the Student Loan as an additional circumstance indicating

her inability to repay the loan will continue for a significant portion of the repayment period).  In

discussing whether the amount of a student loan should influence the dischargeability determination,

the Eighth Circuit Court of Appeals, in a similar circumstance, found:

> Thus, on this record, the only reason he has even a colorable claim of undue hardship
> is the sheer magnitude of his student loan debts.  While the size of student loan debts
> relative to the debtor's financial condition is relevant, this should rarely be a
> determining factor:
>
>> it would be perverse to allow the debtor to benefit from [his] own
>> inaction, delay and recalcitrance by automatically granting discharge
>> simply because the debt is a sizeable one.  This, of course, would
>> benefit those who delay and obstruct the longest and could encourage
>> other students to follow the [same] course.

*Jesperson*, 571 F.3d at 780 (quoting *United States v. Kephart*, 170 B.R. 787, 792 (W.D.N.Y. 1994)).

Ms. Greene complains that the magnitude of her Student Loan, combined with her work experience,

lack of qualifications for higher paying employment, and general history of low annual earnings

precludes payments, and, therefore, the Student Loan must be discharged.[18]  Brief at 10, 24.

---

[17] Ms. Greene and the United States stipulated that the original principal balance of the
Student Loan was $171,607.61 and that interest was capitalized annually until the principal
balance was approximately ten (10) percent higher than the original principal balance.
Stipulation ¶ 15.  At the current payment of zero, after the twenty-five (25) year repayment
period ends in November 2029, the balance of the Student Loan will be between $378,549.23
and $379,154.81.  *Id.* ¶ 19.

[18] In her Reply Brief, Ms. Greene asserts "[i]n *United States* [*Department of Health &
Human Services*] *v. Smitley*, 347 F.3d 109, 121-122 (4th Cir. 2003), the Fourth Circuit made
clear that if the assigned Income Contingent Repayment Plan payment will allow the debtor to
make payments toward the debt 'at a rate that would cover both the accruing interest and some
principal' the debt should not be discharged.  Consequentially, in the Fourth Circuit, as long as
the debtor has the ability to reduce the debt, the inability to retire the debt is immaterial."  Reply

However, what she actually seeks is to take advantage of the generosity of the Income Contingent Plan in an accelerated fashion. To be sure, the balance of her Student Loan will presumptively grow in the future. Stipulation ¶ 19. While lamenting the level of income that would be required to pay even the interest accruing under the Income Contingent Plan, Ms. Greene appears to ignore the provisions of the Income Contingent Plan that forgive any remaining balance of the Student Loan in twenty-five (25) years. *Id.* (stipulating, in pertinent part, that "[i]n accordance with the income contingent repayment terms, the loan balance will be forgiven at the end of the twenty-five year repayment period"). That Congress has provided a statutory remedy to a debtor that would forgive the debt much earlier than the expiration of the twenty-five (25) years is insufficient to support the awarding of relief under 11 U.S.C. § 523(a)(8).

Lastly, Ms. Greene contends that despite her participation in the Income Contingent Plan, the failure to obtain a discharge of the Student Loan will cause the loan to be included on her credit reports and negatively affect her credit rating now and for an indefinite period into the future.[19]

---

Brief at 5. Ms. Greene concludes, based upon this premise along with four other factors, in order to discharge a student debt, the Fourth Circuit Court of Appeals requires a finding of "an inability to cover both the accruing interest and any part of the principal." *Id.*; *see also id.* at 19. In *Smitley*, the court considered the discharge of a Health Education Assistance, or HEAL, loan, which is not analyzed under the *Brunner* standard but instead requires a finding of unconscionability. *Smitley*, 347 F.3d at 115. The debtor's other, non-HEAL educational loan had been discharged by the bankruptcy court, which decision was not appealed. *Id.* The court concluded that the debtor was eligible for an income contingent plan for the HEAL loan, for which the payment "would result in full payment of the accruing HEAL interest plus some principal." *Id.* at 121. There is no support for Ms. Greene's assertion that the Court is required to consider the premise of unconscionability as part of the application of the *Brunner* factors in the instant proceeding.

[19] Ms. Greene offered no proof for her statement at trial that her current participation in the Income Contingent Plan would cause adverse credit reporting to befall her. In *Geyer v. United States Department of Education* (*In re Geyer*), 344 B.R. 129, 133 (S.D. Cal. 2006), the court noted that "[a] borrower whose monthly payment is zero is considered current, and there is no adverse credit reporting to the credit bureaus." This Court will assume, for the purpose of

Brief at 9 (discussing the current impact of the Student Loan on her credit report); Reply Brief at 18

(discussing the impact of the Student Loan on her credit report on securing employment in the

future).  Judge Mitchell has explained why this argument is of no moment in assessing whether a

debtor has satisfied her burden of proof as to the *Brunner* factors:

> The debtor's sole reason for refusing to consider the [Income Contingent Plan] was that such a program was not helpful to her because the debt would still be reflected on her credit report.  According to the debtor, landlords look at credit report in determining whether to accept rental applications, and the amount of the debt she owes would almost certainly result in her application being turned down.  And without the ability to obtain affordable and stable housing, she was unwilling to undergo the chemotherapy necessary to treat her cancer.  For that reason, she argues, her continued liability on the student loan debt would constitute a hardship even if she were not currently required to make payments.

> This kind of hardship, however, is not the hardship contemplated by § 523(a)(8) and *Brunner*.  That "undue hardship" is the hardship the *payments* would cause the debtor, not the collateral effect of having the debts appear on her credit report.  As the District Court noted in *Brunner v. N.Y. State Higher Educ. Servs. Corp.* (*In re Brunner*), the inquiry for the first prong of the test is whether "the necessity of making the monthly loan payment will cause [the debtor's] standard of living to fall below a 'minimal' level."  46 B.R. 752, 754 (S.D.N.Y. 1985) (emphasis added).  Here, the debtor's justification in refusing the [Income Contingent Plan] loan repayment program is not that the monthly payments of zero would pose a hardship (which indeed it could not), but that the cumulative debt on her credit report poses a hardship on her ability to obtain affordable and stable housing.  While an unfortunate situation, the debtor's justification is insufficient for rejecting a program that would allow her to fulfill her loan obligations in a more reasonable and manageable way.  *See, e.g.*, *Frushour*, 433 F.3d at 403.

*Robinson v. Educ. Credit Mgmt. Corp.* (*In re Robinson*), 416 B.R. 275, 282 (Bankr. E.D. Va. 2009).

Accordingly, the Court finds that, despite Ms. Greene's showing of her minimal standard of

living and her noble efforts to reduce her expenses, she has not sustained her burden with regard to

the first prong of the *Brunner* test.  By virtue of her participation in the Income Contingent Plan, Ms.

---

evaluating Ms. Greene's argument and without further evidence to the contrary, that her
participation in the Income Contingent Plan will cause her to experience adverse credit
reporting.

Greene's contractual payments on her Student Loan are presently zero. The resulting mathematic

reality is that the present required monthly payment of zero on the Student Loan does not impact Ms.

Greene's ability to maintain a minimal standard of living. Thus, the Court must conclude she has

failed to prove by a preponderance of the evidence that she cannot maintain a minimal standard of

living for herself and her dependent, based on her current income and expenses, if she is required

to repay the Student Loan. Therefore, the Court finds that Ms. Greene has failed to satisfy the first

prong of the *Brunner* test by a preponderance of the evidence. Despite the requirement that Ms.

Greene satisfy all three prongs of the *Brunner* test to be entitled to a discharge of her Student Loan,

the Court will nonetheless address the remaining two *Brunner* prongs.

> ### C.  Are There Additional Circumstances That Indicate Ms. Greene
> ### Will be Unable to Maintain a Minimal Standard of Living
> ### During a Significant Portion of the Loan Repayment Period?

The second prong of the *Brunner* test demands a debtor prove by a preponderance of the

evidence that additional circumstances exist that indicate her inability to maintain a minimal

standard of living for herself and her dependents is likely to exist for a significant portion of the

repayment period of the student loans. *In re Ekenasi*, 325 F.3d at 546 (quoting *Brunner*, 831 F.2d

at 396). "This factor is the heart of the *Brunner* test" since Congress requires a showing of more

than the normal hardship present in any bankruptcy case. *Frushour*, 433 F.3d at 401. The second

*Brunner* prong is "'a demanding requirement' necessitating 'a certainty of hopelessness' which

confirms that the debtor will not be able to repay the loans." *Spence v. Educ. Credit Mgmt. Corp.*

(*In re Spence*), 541 F.3d 538, 544 (4th Cir. 2008) (quoting *Frushour*, 433 F.3d at 401). A debtor,

therefore, "'must show that the unique or extraordinary circumstances which created the hardship

render it unlikely that the debtor will ever be able to honor [his] obligations.'" *Burton*, 339 B.R. at

31

870 (quoting *Love v. United States* (*In re Love*), 33 B.R. 753, 754-55 (Bankr. E.D. Va. 1983)).  The

burden upon a debtor to show additional circumstances is heavy:  "Only a debtor with rare

circumstances will satisfy this factor.  For example, although not exhaustive, a debtor might meet

this test if she can show 'illness, disability, a lack of useable job skills, or the existence of a large

number of dependents.'"  *Frushour*, 433 F.3d at 401 (quoting *Oyler v. Educ. Credit Mgmt. Corp.*

(*In re Oyler*), 397 F.3d 382, 386 (6th Cir. 2005)).

### 1. Mental or Medical Condition

In her Amended Complaint and at trial, Ms. Greene asserts that she has severe anxiety

disorder that "negatively affects her ability to work" or to improve her level of employment beyond

the low-paying jobs she has held in the past.  Am. Compl. ¶¶ 6-7; Tr. at 26-27.  She testified that she

experienced anxiety disorder prior to her internship with the United States Navy where, she asserts,

she was raped by her supervisor, which event has caused her to be unable to work in an office

environment where men are present.  Tr. at 20, 23-27; Reply Brief at 16-17.

Ms. Greene's corroborating evidence in support of these contentions, however, is non-

existent.  She produced no medical records of any kind nor does she appear to have made any efforts

to obtain records of the treatment that she testified she received many years ago when she was a

military dependent.[20]  Tr. at 27.  Ms. Greene also testified that she has had no treatment by any

health care professional since 2004 and is not on any medication.  *Id*. at 16, 33, 50-51; *see also* Def.

Exh. 104, Response to Interrogatories ("Due to an inability to pay for such services, plaintiff has not

been treated for anxiety disorder by any mental and/or physical health care professional during the

time since plaintiff's loan went into repayment in November 2004.").  Her testimony as to her

---

[20] *See supra* note 5.

participation in support groups was somewhat vague, but apparently Ms. Greene does still receive some type of individual support, though the manner in which such is provided is unclear.  Tr. at 16, 67-68.  The sole evidence of any medical treatment was her testimony as to treatment she apparently received over twenty (20) years ago, *see id.* at 26-27, which she admits in her Reply Brief, included her own, unqualified, self-diagnosis of her condition, *see* Reply Brief at 14.  In furtherance of this position, and in an apparent attempt to retrench, she asserts that it was unnecessary for her to provide any evidence of a medical condition at trial, since "[p]lainly, plaintiff experienced devastating, life shattering consequences of working in a shared work space with a male in 1995." *Id.* at 16; *see also* Tr. at 27 ("The issue of the expert medical testimony, I didn't think that I needed an expert because my issue is very narrow and it doesn't go to whether or not I can work, since I can work.  It just went to limiting the type of work."); Brief at 20.  Ms. Greene admits in her answers to interrogatories that she "has not been treated for an anxiety disorder by any mental and/or physical health care professional during the time since [her] loan went into repayment in November 2004." Def. Exh. 104, Response to Interrogatories.  Further, Ms. Greene asserts she "has not been treated for a mental disorder since 1996." Reply Brief at 16.  Ms. Greene apparently does not receive any Social Security disability payments, as no evidence of such was adduced.  Finally, subsequent to trial and in response to the suggestion by the United States that she was advocating such position, *see* United States Response at 20 n.14, Ms. Greene affirmatively denies that she has post-traumatic stress disorder, Reply Brief at 14.

This Court has previously considered at length the necessity for corroborating evidence to prove the existence of a medical condition and its contribution to a debtor's inability to maintain a minimal standard of living for a substantial portion of the repayment period of a student loan.  In

*Burton*, this Court concluded that the majority rule is that substantial and credible evidence, such

as, but not limited to, corroborating medical evidence, must be presented for the debtor to sustain

his burden of proof regarding his medical condition:

> The majority rule is that substantial and credible evidence, such as corroborating evidence, must be presented for the debtor to sustain his burden of proof regarding his medical condition.  As one court stated, "[t]his Court closely scrutinizes claims for undue hardship based upon psychological or emotional disability due to the susceptibility of such claims to fabrication, exaggeration and fraud.  Well qualified and substantiated expert testimony is essential." *Kelsey v. Great Lakes Higher Educ. Corp.* (*In re Kelsey*), 287 B.R. 132, 136, 143 (Bankr. D. Vt. 2001) (granting discharge of student loans based in large part on corroborating medical evidence presented by the debtor to substantiate her medical claims, including testimony from her psychiatrist that the debtor had been diagnosed with a number of major depressive disorders, that these maladies would prevent her from normal functionality in a work setting, and that the debtor's condition is worsening and incurable); *see also Tirch v. Pennsylvania Higher Educ. Assistance Auth.* (*In re Tirch*), 409 F.3d 677, 681 (6th Cir. 2005) (denying discharge of student loans when the only evidence presented at the trial court level was the debtor's testimony that she was unable to work, which was "unsupported by competent medical or psychological evidence"); *Rose v. Educ. Credit Mgmt. Corp.* (*In re Rose*), 324 B.R. 709, 712 (B.A.P. 8th Cir. 2005) (denying discharge based in part on the fact that the student loan debtor had presented "no evidence . . . that she has health issues that will in the near future prevent her from working"); *Pobiner v. Educ. Credit Mgmt. Corp.* (*In re Pobiner*), 309 B.R. 405, 419 (Bankr. E.D.N.Y. 2004) (finding that debtor's failure to provide corroborating evidence from a physician or psychotherapist precluded a hardship discharge based on a mental condition, stating that "[s]tudent loan debtors claiming undue hardship as a result of a medical condition must provide evidence to corroborate their claims"); *Burkhead v. U.S.* (*In re Burkhead*), 304 B.R. 560, 563-66 (Bankr. D. Mass. 2004) (denying the debtor's request for a hardship discharge despite the fact that the debtor produced a 24-page summary of prior medical history at trial to support her hardship claim, because the court was not convinced, based on its review of her records and because the debtor "did not call any expert witnesses to testify about her long-term prognosis," that she had a condition that precluded her from ever earning enough to repay); *Pace v. Educ. Credit Mgmt. Corp.* (*In re Pace*), 288 B.R. 788, 793 (Bankr. S.D. Ohio 2003) (refusing to discharge debtor's student loans because the debtor's claims were not "corroborated by testimony or even an affidavit of any physician or other medical professional, familiar with her condition," and noting that "it is not possible to make a discharge determination without some corroboration of the medical conditions and how long they will persist"); *Garrett v. N.H. Higher Educ. Assistance Found.* (*In re Garrett*), 180 B.R. 358, 364 (Bankr. D.N.H. 1995) (finding that even though the

> debtor testified that she had been positively tested for multiple sclerosis, there was
> no medical evidence adduced at trial that multiple sclerosis had been established, and
> therefore "the evidence on [the debtor's] health condition [was] insufficient to
> determine whether it will substantially affect her employment in the future");
> *Daugherty v. First Tenn. Bank* (*In re Daugherty*), 175 B.R. 953, 959 (Bankr. E.D.
> Tenn. 1994) (denying discharge of student loan based, to a large extent, on the fact
> that the record contained "no proof, other than her own testimony, that she is unable
> to work").

*Burton*, 339 B.R. at 874-75; *see also Braun v. Sallie Mae* (*In re Braun*), Adv. No. 11-01529, 2012

WL 5199163, at *7 (Bankr. E.D. Va. Oct. 19, 2012) (unpublished decision) (noting that, while a

debtor seeking to discharge his student loan obligations may have difficulty engaging medical

professionals to testify as expert witnesses, the majority rule requires the debtor to present

substantial, credible corroborating evidence to sustain his burden of proof under the second *Brunner*

prong); *Todd v. Access Group, Inc.* (*In re Todd*), 473 B.R. 676, 690 n.21 (Bankr. D. Md. 2012) ("As

pointed out by Judge St. John [in] *In re Burton* . . . it is a rare thing for a debtor who seeks the

discharge of student loan to have the means to afford an expert medical professional to testify on her

behalf. . . . Here, Ms. Todd's own materially undisputed testimony is compelling enough. However,

to have the thoroughly objective and credible input of Dr. Gopalan [the debtor's long-time

physician] layered on top of her testimony raises the weight and substance of the evidence to the

clearly convincing level."); *Triplett v. ACS/PNC Educ. Loan Ctr.* (*In re Triplett*), 357 B.R. 739, 743-

44 (Bankr. E.D. Va. 2006) (quoting *Pace v. Educ. Credit Mgmt. Corp.* (*In re Pace*), 288 B.R. 788,

793 (Bankr. S.D. Ohio 2003)) ("However, where a claim for discharge based on undue hardship is

based on a student loan debtor's testimony, a court simply cannot make a discharge determination

'without some corroboration of the medical conditions and how long they will persist . . . . The

testimony of the Plaintiff alone is not sufficient.'").

The need for corroborating evidence is especially acute when a debtor alleges some type of

medical or mental issue is so persistent in nature that she is prevented from retiring a student loan.

As one court has noted, mental illness can well be found as a circumstance justifying discharge of

a student loan, but the mental illness must be proven by more than mere allegations by a debtor:

> Mental illness, if sufficiently debilitating and unlikely to improve, can provide support for discharging a student loan debt. *See, e.g.*, *In re Pena*, 155 F.3d 1108, 1113 (9th Cir. 1998) (debtor's depression, manic depression, schizophrenia, and paranoia supported discharge of student loans); *Meling v. United States of America* (*In re Meling*), 263 B.R. 275, 279 (Bankr. N.D. Iowa 2001) (debtor's bipolar disorder supported discharge of student loans); *Green v. Sallie Mae Servicing Corp.* (*In re Green*), 238 B.R. 727, 737 (Bankr. N.D. Ohio 1999) (debtor's bipolar disorder supported discharge of student loans). However, the bankruptcy court in *Swinney v. Academic Fin. Serv.* (*In re Swinney*), 266 B.R. 800, 805 (Bankr. N.D. Ohio 2001) (citing *Hatfield v. William D. Ford Fed. Direct Consolidation Program* (*In re Hatfield*), 257 B.R. 575, 581-82 (Bankr. D. Mont. 2000)), held that substantial credible evidence must support the existence of the mental illness. *See also Dennehy v. Sallie Mae* (*In re Dennehy*), 201 B.R. 1008, 1012 (Bankr. N.D. Fla. 1996) (debtor with bipolar disorder did not present medical evidence that would suggest his bipolar disorder would prevent him from obtaining employment in the future or other evidence that his current financial situation would persist into the future; therefore the court determined his student loan debt was nondischargeable). The bankruptcy court in *Swinney* opined that although such evidence does not necessarily have to consist of expert testimony, it should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position. *Swinney*, 266 B.R. at 805. *See also Hallberg v. Montana Guaranteed Student Loan Program* (*In re Hallberg*), Nos. 01-21988-7, 01/00071, 2001 WL 1555191, at *2 (Bankr. D. Mont. Nov. 30, 2001) (although debtor may testify that she was diagnosed and treated for depression at a past date, such facts have little bearing on her current mental health; debtor is not qualified to establish factually, through her own testimony, that she suffers from depression; if she currently suffers from depression it must be established through expert testimony and/or exhibits).

*Long v. Educ. Credit Mgmt. Corp.* (*In re Long*), 271 B.R. 322, 329 (B.A.P. 8th Cir. 2002), *rev'd on

other grounds*, 322 F.3d 549 (8th Cir. 2003). This Court also expounded upon the impropriety of

the Court to reach an uninformed conclusion, without any corroborating evidence, as to the impact

a debtor's medical condition will have on future employment opportunities:

> The majority view on the subject is that some evidence is necessary to

36

corroborate the debtor's testimony in order to make a finding that the debtor's medical condition will have a long-term impact on his employment opportunities. . . .

. . . [T]his Court respects the decisions of the courts that have permitted a hardship discharge without corroboration of the debtor's medical condition; however, this Court is not equipped to take the role of a medical professional nor is it appropriate for this Court to make a medical diagnosis that Burton's prognosis is unlikely to improve.  Additionally, the cases that have found for the debtor without corroboration are in the minority and at least one of the cases appears to have facts distinguishable from the present case.  *In re Mosley*, 330 B.R. at 832 (finding for the debtor in the absence of corroboration, based in part, on the reasoning that the debtor was *pro se* and attempted to, albeit unsuccessfully, offer corroborating evidence in the form of letters from healthcare providers and the Department of Veterans Affairs).

. . . [T]his Court will not make a futuristic diagnosis without some corroboration.

*Burton*, 339 B.R. at 878 n.38.

Ms. Greene's overarching argument throughout these proceedings is that the events that occurred while working with the Navy were sufficiently devastating and life-shattering to obviate the need for any medical explanation of their after-effects on the types of environments in which she is able to work. Reply Brief at 16-17.  However characterized, it is apparent Ms. Greene attributes much of her past and anticipated future employment difficulty to the mental reservations that cause her to severely restrict her work opportunities to exclude any where men are present. Notwithstanding the obvious seriousness of the events that occurred during her internship with the United States Navy, for this Court to presume the continuing effects of those events preclude employment in the vast majority of all work environments and are perpetual, without any evidence of medical diagnosis or even treatment, is overly speculative and inappropriate.  The absence of any corroborating evidence of the alleged continuing disability caused by the events prevents this Court

from finding a physical or medical condition exists to satisfy the second prong of the *Brunner* test.[21]

During the proceedings, Ms. Greene also cited her state of poverty as preventing her from obtaining medical treatment and submitting any of her earlier treatment records when she was a military dependent. *See supra* note 5; *see also* Tr. at 33 ("I didn't have medical records that I could put into evidence because I don't have any way to see a doctor . . . ."); Reply Brief at 14. This explanation for the lack of any corroborating medical evidence was also considered in *Burton*:

> This Court is not unaware or unsympathetic to the difficulties debtors face in attempting to subpoena professionals to testify at trial. Burton, given his limited Social Security disability income, is clearly not a wealthy individual and thus has obvious financial limitations to his ability to present evidence at trial. Additionally, many debtors who are in financial straits are unable to afford private health insurance, which creates its own set of complexities. As one case discussed, "if debtors are even able to obtain medical treatment, they ordinarily do not have access to private health care. Therefore, it is challenging for debtors to enlist the help of medical professionals, particularly experts, in the prosecution of their case." *Mosley v. Gen. Revenue Corp.* (*In re Mosley*), 330 B.R. 832, 843, 845 (Bankr. N.D. Ga. 2005) (holding that the *pro se* debtor met his burden even without expert testimony, in light of the fact that the debtor was *pro se* and attempted unsuccessfully to submit numerous documents to the court).

*Burton*, 339 B.R. at 877. In addition to expert medical testimony, other alternatives may suffice to provide adequate corroborating proof of a medical condition:

> This Court, in light of the paradox discussed [*i.e.*, balancing the cost of expert testimony versus the need for corroborating evidence], and the fact that other credible evidence often exists, does not suggest expert testimony is the only method of corroboration available to debtors. The court in *In re Swinney*, in denying discharge, held similarly and found that "the Debtor, beyond her self-supporting statements, did not introduce any evidence of her mental illnesses," and therefore held:
>
> > Although such evidence does not have to necessarily consist of

---

[21] In light of the Court's ruling that Ms. Greene has failed to provide any corroborating evidence of a mental or medical condition to satisfy the second *Brunner* prong, the Court declines to address the nature of the evidence required to satisfy that element of the *Brunner* test. *See* United States Response at 18 (asserting that expert medical testimony is required).

> extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position . . . . For example, if properly authenticated, letters from a treating physician could be utilized.

> *Swinney v. Academic Fin. Servs.* (*In re Swinney*), 266 B.R. 800, 805 (Bankr. N.D. Ohio 2001) (citations omitted); *see also Chime v. Suntech Student Loan* (*In re Chime*), 296 B.R. 439, 445 (Bankr. N.D. Ohio 2003) (agreeing that "some corroborating evidence must be introduced to substantiate the debtor's position," and that "bare allegations simply will not suffice").

*Id.* at 879.  Here, Ms. Greene has introduced even less evidence of her medical condition than what this Court found wanting in *Burton.*[22]  Thus, like the Court concluded in *Burton*, despite the sympathetic nature of the facts before the Court and its observations that Ms. Greene's circumstances are certainly trying, the evidence before the Court is insufficient to determine whether Ms. Greene suffers a heretofore undiagnosed medical condition, and, if so, whether that condition is such that she will be unable to maintain a minimal standard of living during a significant portion of the repayment period of the Student Loan.

### 2.  Long Duration of Poverty

Ms. Greene also argues that the long duration of her poverty provides adequate proof that her inability to pay the Student Loan is likely to persist for the indefinite future.  *See* Brief at 15-17; *see also* Tr. at 11, 28 (asserting that the Court should extrapolate, based upon the eight-year period since the Student Loan was obtained, that her circumstances will not improve during the remainder

---

[22] "Burton did testify to numerous hospitalizations and three suicide attempts; however, he did not offer any corroboration of these events, such as medical records.  He also testified that he takes three prescription drugs; however, he did not attempt to introduce the prescriptions or the pill bottles into evidence.  In fact, the only potentially corroborating evidence introduced was the fact that Burton receives Social Security disability, but even in regard to his Social Security disability, there was no documentation presented at trial." *Burton*, 339 B.R. at 879-80.

of the repayment period).  In support, Ms. Greene cites *United States v. Brown*, No. 1:07CV79, 2007

WL 4190399 (N.D. W. Va. Nov. 21, 2007) (unreported decision), which affirmed a decision of the

bankruptcy court (*Brown v. Fairmont State University* (*In re Brown*), No. 06-24, 2007 WL 1747135

(Bankr. N.D. W. Va. June 15, 2007) (unreported decision)), granting discharge of a student loan.

*See* Brief at 13-14, 18; *see also* Reply Brief at 13, 22.  Noting that the debtor there had been "trapped

in a 'cycle of poverty,'" the bankruptcy court concluded the fifty (50) year old debtor had proven

her financial plight was indefinite:

> The Debtor testified that her current hourly rate is substantially higher than her
> earnings prior to this position.  In examining the Debtor's Schedule I filed on
> September 28, 2005, the court notes that she was employed in counter sales and had
> a net monthly income of $390.  The Debtor has more than doubled her income with
> her current employment, but is still unable to meet her minimal living expenses.  *See
> e.g.*, *Oyler v. Educ. Credit Mgmt. Corp.* (*In re Oyler*), 397 F.3d 382, 386 (6th Cir.
> 2005) ("Choosing a low-paying job cannot merit undue hardship relief."); *Frushour*,
> 433 F.3d at 401 ("Indeed, Frushour points to no circuit court that has held a debtor
> can voluntarily take a low-paying job in her preferred field, and then refuse to repay
> her student loans by claiming undue hardship.").  She testified that she has actively
> sought higher paying employment on a management level with various banks and
> retail stores, but she has been unsuccessful due to her lack of experience and her poor
> credit ratings.  The Debtor stated that although she is not particularly satisfied with
> her job, she recognizes that her age and lack of prior experience limit the
> opportunities available to her.  The Debtor further testified to her long-standing
> efforts since graduating from Fairmont State University to obtain new employment
> by regularly reviewing the job advertisements in the local newspapers.  Unlike the
> debtor's profile in the *Frushour* case, here the Debtor has not chosen to be
> underemployed, nor has she held higher-paying jobs in the past that would belie her
> current state of affairs.

*Brown v. Fairmont State Univ.* (*In re Brown*), No. 06-24, 2007 WL 1747135, at *4 (Bankr. N.D. W.

Va. June 15, 2007) (unreported decision).[23]

---

[23] Despite her representations to the contrary, some of the other decisions cited by Ms.
Greene to support her assertion that the duration of her poverty alone satisfies the second
*Brunner* prong relied upon credible evidence of other special circumstances besides the long-
term poverty of the debtor.  *See, e.g.*, *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1311
(10th Cir. 2004) ("Ms. Polleys's mental health problems are at least as substantial and long

Ms. Greene likens herself to the debtor in *Brown*, asserting that she too is entitled to a discharge of the Student Loan because she has not held a financially lucrative job in her twenty-five (25) year work history, despite her representations that she has sought such employment; during a majority of the last nine (9) years, she has consistently earned less income than delineated by the federal poverty levels; and her income has never exceeded her necessary expenses.  Brief at 16; Reply Brief at 10.  She further argues that the United States' determination during each of the past

---

lasting as the disability the Ninth Circuit found to be sufficient to preclude the debtor from paying her student loan in *In re Pena*, 155 F.3d 1108 (9th Cir. 1998)."); *Thomsen v. Dep't of Educ.* (*In re Thomsen*), 234 B.R. 506, 513 (Bankr. D. Mont. 1999) ("This Court finds that Raymond's bipolar disorder described in this case is a 'serious, ongoing mental disability' which prevents Raymond from obtaining meaningful permanent employment."); *Kasey v. Pa. Higher Educ. Assistance Auth.* (*In re Kasey*), 227 B.R. 473, 476 (Bankr. W.D. Va. 1998) ("Secondly, with Debtor suffering from depression, which appears to be a debilitating problem, and supporting three children, all of which are still in school and will be for several years, and without her completed education, it is highly unlikely that her employment will improve in the future."); *Mayer v. Pa. Higher Educ. Assistance Auth.* (*In re Mayer*), 198 B.R. 116, 126 (Bankr. E.D. Pa. 1996) (evidence showed that debtor was suffering from mental illness that drastically limited her employment opportunities); *Reilly v. United Student Aid Funds* (*In re Reilly*), 118 B.R. 38, 41 (Bankr. D. Md. 1990) (concluding that a divorced mother of three (3) young children, who did not have a college degree and whose former husband was incurably ill and thus unable to contribute to the children's support, was entitled to a discharge of her student loans, which totaled less than $2,800.00).

Another decision relied on by Ms. Greene, where the court discharged a student loan without a showing of a medical problem, family difficulty, or other special circumstance, lamented its inability to rule otherwise based upon binding Ninth Circuit precedent:

> If the court were not bound by precedent, it would hold that there is a threshold requirement for that the debtor demonstrate some sort of medical problem, family difficulty, or other underlying special circumstance which places the debtor in a more difficult position than most other people.  Once this is established, the student loans would be discharged if the debtor is unable to pay them now or in the foreseeable future.  The court would not allow the loans to be discharged without an underlying hardship not endured by anyone who owes more than he can afford to pay.

*Patterson v. Educ. Credit Mgmt. Corp.* (*In re Patterson*), 251 B.R. 866, 868 (Bankr. N.D. Cal. 2000).

eight (8) years that her monthly payment amount on the Student Loan be zero also supports a finding

that her impoverished status is persistent and not merely short-term in nature.  Reply Brief at 7, 9.

Finally, Ms. Greene points to Exhibit 117 submitted by the United States, payment calculations on

the Student Loan based upon her historical income amounts, which she asserts contemplates the

payments will remain fixed at zero for the remainder of the repayment period.  *Id.* at 20 (citing Def.

Exh. 117, Loan Repayment Calculations).

      However, as the Fourth Circuit Court of Appeals has taught, the longevity of a debtor's state

of poverty, without more, is insufficient proof of the additional circumstances necessary to prove

the second *Brunner* element:

> We have said that "[h]aving a low-paying job . . . does not in itself provide undue
> hardship, especially where the debtor is satisfied with the job, has not actively sought
> higher-paying employment, and has earned a larger income in previous jobs."  *Id.*
> We are not unsympathetic to the disadvantages of her current circumstances, but the
> facts point to no "additional circumstances," outside of the normal hardships faced
> by bankruptcy petitioners, that would render her situation hopeless.

*Spence v. Educ. Credit Mgmt. Corp.* (*In re Spence*), 541 F.3d 538, 544 (4th Cir. 2008) (quoting

*Frushour*, 433 F.3d at 401).  In other words, the Court must look at the underlying cause or causes

of the persistent low income and determine if the circumstances are such that they will continue for

a substantial portion of the remaining loan repayment period.  *Frushour*, 433 F3d. at 401.

      Ms. Greene has failed to sustain her burden of proof as to the underlying cause for her

persistent low income.  Despite Ms. Greene's averments and her assertion that "it is not disputed that

plaintiff has no hope of ever repaying" the Student Loan, Reply Brief at 18, the instant matter is

factually distinguishable from *Brown*.  First, and most critically, the *Brown* court found the initial

*Brunner* prong was satisfied in that case.  *In re Brown*, 2007 WL 1747135, at *2.  Here, for the

reasons stated *supra*, Ms. Greene failed to satisfy that element of the *Brunner* test.  Second, unlike

the circumstances in *Brown*, where the debtor testified not only as to the types of jobs she had

pursued but also provided detailed explanations as to why her efforts were unsuccessful, *see id.* at

\*4, Ms. Greene's evidence of attempts to obtain gainful employment in her fields of training is

somewhat vague.  To be sure, Ms. Greene did testify as to the ongoing nature of her job search and

her registration with the Virginia Employment Commission. Tr. at 17, 44-45.  She also testified that

she "made a list of some companies that had seemed like if I could get—if I could hear back from

them that if they had any alternate work arrangements.  In other words, I have been tracking the

employment."  *Id.* at 40.  *See also* Reply Brief at 25 (referencing the "list of potential employers"

by which she "tracks employment opportunities (job openings) and requirements").  However, Ms.

Greene did not offer the referenced list into evidence to substantiate her testimony regarding her job

search.  While Ms. Greene cited several specific potential employers to whom she had sent resumes

but had not received a response, including Agility, a contracting firm; the Virginia Air and Space

Museum; and Kimley-Horn & Associates, another contracting firm, Tr. at 41-42, she did not,

contrary to her representation in her Reply Brief, "identify specific employers where she had sought

employment *and was refused*."  *See* Reply Brief at 22 (emphasis added).  In response to questions

from the United States, Ms. Greene confirmed that she has also applied for jobs outside the

engineering field, such as in teaching,[24] Tr. at 42-43, and telemarketing services, *id.* at 44.

According to Ms. Greene, obtaining a telemarketing job is difficult because "[y]ou have to search

and be sure that it's a legitimate company" and also referenced her bankruptcy and associated credit

---

[24] Ms. Greene also testified that she had previously signed up to be a substitute teacher, Tr. at 43-44, and she was "sure" she was still on that "list" but that she had not received any calls to perform such work.  *Id.* at 47.  She did not specify which school system she was referencing nor did she offer any proof, such as a letter from the school system, that she was indeed on the list of substitute teachers for the school district.

issues as impediments to securing such a job. *Id.* at 44. She has apparently also researched to some

extent obtaining jobs with or working at home for women-owned businesses. *Id.* at 45. Ms. Greene,

however, provided little additional information on these efforts or provide specific examples these

efforts, other than to represent that she has made application to businesses that are both female-

owned and non-female owned. *Id.*[25]

Ms. Greene's explanations as to why her attempts to gain employment were unsuccessful

are largely based on speculation and conjecture. *See, e.g.*, Tr. at 30 (asserting that the telemarketing

jobs she has applied for are not always available); *id.* at 32 ("I feel that it is true that sometimes I

wouldn't get hired because my—all the problems that I have with my credit."); *id.* at 40 (testifying

that she had submitted resumes to civil engineering firms but had "not heard anything back"); *id.*

at 46 (citing limited transportation resources as the constraint upon seeking work at an all-girls

school). Ms. Greene appears to largely link her status of poverty to her anxiety disorder, which she

claims prevents her from working in any office environment where men are present.[26] Yet, there is

no corroborating proof regarding this circumstance. Given Ms. Greene's extensive education, her

relatively young age, her articulate testimony, her well-developed writing skills and highly

---

[25] In her Reply Brief, Ms. Greene cites to her 2010 federal tax returns, admitted into evidence as Defendant's Exhibit 108, to show that she "established her own business for additional income." Reply Brief at 24; *see also id.* at 28 ("Plaintiff has further established her own business for additional money and does odd jobs for additional income."). Ms. Greene provided no testimony on this subject, none of her exhibits reference any self-employment efforts by Ms. Greene, and neither her Brief nor Reply Brief elaborate on these efforts.

[26] As noted, Ms. Greene also cites her litigation against the Navy, *see* Tr. at 30, her lack of exposure to current technology, and passage of time since her degrees were awarded, *see id.* at 52-53; Brief at 20; Reply Brief at 17, as additional causes for her lack of lucrative employment. However, she also argues in her Reply Brief that her "lack of credentials and background factors are more prohibitive in obtaining work than her need for an alternative work environment." Reply Brief at 25.

intelligent demeanor, and having but one dependent, her record of poverty is unexplained by any tangible evidence.  As lamentable as Ms. Greene's financial circumstances are and have been, no plausible causation sufficient to sustain her burden of proof has been tendered except for her alleged anxiety disorder, which has no supporting evidence here.[27]

### 3. Lack of Usable Job Skills

Ms. Greene also asserts her lack of job skills as an additional circumstance.  Specifically, she asserts her educational training is severely outdated, especially in light of the technological advancements since earning her civil engineering degree; her minimal work experience overall and none in the engineering field; her failure to complete her graduate education; her inability to pass the fundamentals of engineering exam; her lack of professional licenses or certifications, or the ability to obtain them; and her inability to pass a background check.  Brief at 20; Reply Brief at 17; *see also* Tr. at 12.  It is true some time has expired since the award of her undergraduate degree in engineering from The Johns Hopkins University.  However limiting the passage of time since her engineering degree was conferred may be, the extensive additional education and the obvious intelligence she possesses belie a lack of training or aptitude.  Even if Ms. Greene is correct that the passage of time has made her one-time engineering skills incapable of revival, she obviously possesses other skills, education, and training that would make her more successfully employable but for her uncorroborated mental condition that she believes prevents her from working in any typical employment environment.[28]

---

[27] Ms. Greene states that "[s]he will live in dismal poverty for the rest of her life."  Brief at 15.  What remains unproven is why she is unable to support herself.  Her often-stated assumption of hopelessness is unsupported by any corroborating evidence.

[28] To the extent that issues raised by Ms. Greene in the context of the first *Brunner* prong would be more appropriately considered or would serve as additional considerations under the

Based on all of the foregoing, the Court must find Ms. Greene has failed to sustain her burden of proof by a preponderance of the evidence concerning the second *Brunner* prong.

### D.  Has Ms. Greene Made a Good Faith Effort to Repay the Student Loan?

The third *Brunner* factor requires Ms. Greene to show that she "'has made good faith efforts to repay [her] loans.'"  *Frushour*, 433 F.3d at 402 (quoting *Brunner*, 831 F.2d at 396).  "This factor looks to the debtor's 'efforts to obtain employment, maximize income, and minimize expenses.'" *Id.* (quoting *O'Hearn v. Educ. Credit Mgmt. Corp.* (*In re O'Hearn*), 339 F.3d 559, 564 (7th Cir. 2003)).  In addition, the debtor must demonstrate that her hardships are the result of factors beyond her control.  *Id.*  As this Court has previously outlined, the final *Brunner* factor "recognizes that 'with the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses.'"  *Burton*, 339 B.R. at 882 (quoting *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 779 (7th Cir. 2002)).  Further, this Court explained in *Burton* that while a primary consideration in this stage of the analysis is whether the debtor has actually made any payments on the loan, the failure to make payments on student loan obligations does not necessarily foreclose a finding of good faith if the debtor has had no funds with which to make those payments.  *Id.* (citing  *Hall v. U.S. Dep't of Educ.* (*In re Hall*), 293 B.R. 731, 737 (Bankr. N.D. Ohio 2002); *Elebrashy v. Student Loan Corp.* (*In re Elebrashy*), 189 B.R. 922, 928 (Bankr. N.D. Ohio 1995)); *accord Wilson v. Educ. Credit Mgmt. Corp. v. Wilson* (*In re Wilson*), No. 01-30624, 2002 WL 32155401, at *4 (Bankr. E.D. Va. June 25, 2002) (unreported decision) (quoting *Lohr v. Sallie Mae* (*In re Lohr*), 252 B.R. 84, 89 (Bankr. E.D. Va. 2000)) ("Good faith effort also requires 'the

---

second *Brunner* prong, the Court's conclusions, as set forth *supra*, would be the same at this stage of the analysis.

46

debtor to have made payments when he or she was in a position to make such payments.'"); *see also Burton*, 339 B.R. at 884 (citing *In re Elebrashy*, 189 B.R. at 929) ("[F]ailure to make payments is not bad faith *per se*."). It is undisputed that Ms. Greene has made no payments on the Student Loan by virtue of her payments being set at zero under the Income Contingent Plan since the loan has been in repayment. Stipulation ¶¶ 20-22. Thus, the Court must analyze other considerations present in the instant matter to determine whether Ms. Greene has made a good faith attempt to repay the Student Loan.[29]

As previously stated, it appears uncontested that Ms. Greene has attempted to limit her expenses and lives under very difficult and uncomfortable conditions. The more difficult analysis is whether she has made good faith efforts to obtain employment so as to maximize her income. Regrettably, under the circumstances here, this aspect of the third *Brunner* prong may not be considered in isolation of the second prong of the *Brunner* analysis. Ms. Greene testified that she has dramatically limited the type of work she will accept because of her anxiety disorder and her inability to work in an office environment where men are present. If her disorder is genuine and her inability to work with men present does in fact flow from her medical disorder, then her lack of success in employment does not necessarily influence a finding of a lack of good faith on her part. However, as detailed extensively earlier, absolutely no corroborating evidence to support her claimed disorder was adduced. Ms. Greene is well-educated, including a degree in civil engineering from a most prestigious university, and presented herself to this Court as a capable individual. The

---

[29] The United States urges the Court to equate Ms. Greene's desire to discharge the Student Loan when she has a payment amount of zero under the Income Contingent Plan with situations where a debtor refuses to enter into the Income Contingent Plan or similar plans to thus find that Ms. Greene is not proceeding in of good faith. United States Response at 36. The Court declines to address this contention in light of the findings herein that Ms. Greene has failed to satisfy the *Brunner* test *en toto*.

absence of any corroborating proof prevents this Court from assuming that Ms. Greene's long unemployment and underemployment are the product of a disability or other events beyond her control. The resulting picture is of a well-educated, articulate woman who has explained her chronic underemployment but failed to produce any proof other than her admitted self-diagnosis that is unsupported by any medical evidence.

Ms. Greene also attempts to explain her inability to obtain better-paying employment by asserting she does not learn concepts and principles associated with engineering at a quick pace, Tr. at 17-18, 27, Reply Brief at 26; that she quickly discovered while at The Johns Hopkins University she was not proficient in calculus, Tr. at 28-29; and that since her engineering degree was obtained some time ago, she is not as skilled at using the current technology as she needs to be, *id*. at 52-53; Reply Brief at 26. All of this notwithstanding, in the absence of substantial proof that Ms. Greene's claimed medical condition is causally linked to her lack of financial success, her record of unemployment and underemployment simply is not explicable and renders the Court unable to make a finding of good faith attempts to repay the Student Loan.

Ms. Greene further asserts that the rate of growth of the Student Loan balance,[30] in comparison with her monthly household income (including food stamps), is high and "out of proportion" to her other household expenses. Brief at 22; Reply Brief at 29. Ms. Greene argues, however, that this fact should not weigh toward a finding that she has not made a good faith effort to repay the Student Loan. Brief at 22; Reply Brief at 30. In support, Ms. Greene asserts that she consolidated numerous educational loans and entered into the Income Contingent Plan immediately upon leaving school. Brief at 22; Reply Brief at 30. The size of the Student Loan results instead,

---

[30] The parties stipulated that the Student Loan accrues interest at a rate of $696.85 per month. Stipulation ¶ 18.

48

she maintains, from her inability to repay. Reply Brief at 30. A review of Ms. Greene's bankruptcy schedules indicates total debt of $309,569.00, all of which is unsecured debt. Of that amount, the Student Loan comprises $272,154.00, or 87.9%, of her unsecured debt.[31] "Courts have usually refused to discharge student loans when they are the bulk of the debtor's debt or when student debt is the first or second largest single type of debt." *Lohr v. Sallie Mae* (*In re Lohr*), 252 B.R. 84, 89 (Bankr. E.D. Va. 2000). Ms. Greene, as detailed *supra*, has failed to sustain her burden as to the underlying cause of her inability to repay the Student Loan. Thus, the amount of Ms. Greene's Student Loan unfortunately must be considered as weighing against a finding of good faith.

The record is clear that Ms. Greene has made no actual payments on her loan since 2004. There is no evidence as to whether any payments or deferrals occurred prior to 2004 on the original loans that were consolidated into the Student Loan. Notwithstanding this absence of evidence of any payments by Ms. Greene, her entry into the Income Contingent Plan is an indicia of her good faith. This Court has previously examined the impact of participation, or failure to do so, upon the good faith analysis:

> While courts look to the debtors willingness to entertain such income-contingent repayment plans as an indicia of good faith, it is not *per se* lack of good faith to fail to consider such a plan. *See Cota v. U.S. Dep't of Educ.* (*In re Cota*), 298 B.R. 408, 420 (Bankr. D. Ariz. 2003) ("The court agrees that the good faith requirement of *Brunner* requires that the court consider [the debtor's] conduct in failing to explore alternatives, such as the [Income Contingent Plan]. However, the failure to explore such programs, especially if the programs offer no effective relief, is not *per se* an indication of lack of good faith."); *see also Pennsylvania Higher Educ. Assistance Agency v. Birrane* (*In re Birrane*), 287 B.R. 490, 500 (B.A.P. 9th Cir. 2002) (quoting

---

[31] Two debts listed on Ms. Greene's Schedule F are listed as being owed to "Direct Loan Servicing Center, U.S. Department of Education." The first is in the amount of $188,727.00, and the second is in the amount of $83,427.00. Even if the Court utilizes the stipulated Student Loan balance of $227,109.98 (*see* Stipulation ¶ 16) to calculate Ms. Greene's total debt and the percentage of that which is the Student Loan, the total debt amount would be $264,525.00, of which the Student Loan would comprise 85.9%.

>*U.S. Dep't of Educ. v. Wallace* (*In re Wallace*), 259 B.R. 170, 185 (C.D. Cal. 2000) ("Good faith is also measured by a debtor's effort—or lack thereof—to negotiate a repayment plan.")). Even after filing an adversary proceeding to discharge a student loan, "[a] debtor's obligation to make 'good faith' efforts to repay [her] education loans is not extinguished," and where a debtor first learns about the repayment programs during the trial of the adversary, a court considers whether any discussions concerning such options takes place. *Id.* (quoting *In re Wallace*, 259 B.R. at 185). However, these programs are "no silver bullet," and if the creditors fail to advise particular debtors of the programs and assist the debtors with pursuing them, failure to consider these alternatives does not indicate a lack of good faith. *In re Cota*, 298 B.R. at 421 (quoting *Cheney v. Educ. Credit Mgmt. Corp.* (*In re Cheney*), 280 B.R. 648, 666 (N.D. Iowa 2002)).

*Burton*, 339 B.R. at 886-87; *accord Eddy v. Educ. Credit Mgmt. Corp.* (*In re Eddy*), Adv. No. 1:05-ap-00210, 2006 WL 2818793, *4 (Bankr. N.D. W. Va. Sept. 28, 2006) (unreported decision) (citing *Tirch v. Pa. Higher Educ. Assistance Agency*, 409 F.3d 677, 682-83 (6th Cir. 2005)) ("[W]hile not always dispositive, a debtor's efforts to explore an income contingent repayment plan or loan consolidation options indicate that a debtor is putting forth her best efforts to repay the loan obligations in light of her financial circumstances."). Thus, just as failure to enter the Income Contingent Plan is not preclusive of a finding of good faith, neither does entry into this or a similar program, without more, mandate a finding of good faith on the part of a debtor. Because Ms. Greene has failed to carry her burden by submitting any other evidence, the Court concludes she has not satisfied her overall burden of proof as to the final prong of the *Brunner* test.

## IV. Summary

The Court is not unsympathetic to the difficulties that confront Ms. Greene. However, Judge Mitchell aptly reminds us*:*

>As the Fourth Circuit has noted, "Congress, in enacting § 523(a)(8), set a high bar for a debtor seeking to discharge government-guaranteed educational loans." *Frushour*, 433 F.3d at 403. While the debtor's situation is compelling, the Fourth Circuit has refused to allow debtors to discharge their student loan obligations in cases where the circumstances were similar. *See e.g.*, *Spence*, 541 F.3d at 542, 544

50

(denying undue hardship discharge of $161,000 in student loan debts to debtor in her late 60s suffering from diabetes and high blood pressure); *Mosko*, 515 F.3d at 322, 327 (no undue hardship discharge for debtors with one dependent whose combined student loan debts totaled $120,573 despite fact that husband suffered from excessive daytime sleepiness which limited his employment prospects); *Frushour*, 433 F.3d at 396-97, 404 (no undue hardship for single parent debtor with one dependent and $12,149 in student loans); *Ekenasi*, 325 F.3d at 543 (undue hardship discharge more than two years before debtor's scheduled completion of chapter 13 plan premature despite $89,418 in student loan debt and debtor's six dependent children).

*Robinson v. Educ. Credit Mgmt. Corp.* (*In re Robinson*), 416 B.R. 275, 282 (Bankr. E.D. Va. 2009).

As her circumstances currently stand, Ms. Greene may ultimately receive the relief she seeks: absolution of the balance of the Student Loan. According to the United States, assuming the ratio of Ms. Greene's assets and liabilities remains comparable to their current levels, no tax liability would befall Ms. Greene were the balance of the Student Loan to be forgiven. In order to do so, however, the twenty-five (25) year repayment period under the Income Contingent Plan must expire.[32] This is not to say, however, that Ms. Greene should not continue her efforts to improve her financial situation, which her exhibited writing and speaking skills along with her intelligent demeanor all favor.

For the foregoing reasons, the Student Loan of Ms. Greene should not be discharged, and her Amended Complaint should be dismissed.[33] A separate Order to this effect will be entered.

Ms. Greene is advised that an appeal lies from this matter to the United States District Court

---

[32] The Court further notes that the United States, in its Response, suggests another avenue by which Ms. Greene could pursue a discharge of her Student Loan. *See* United States Response at 19 n.13 (suggesting that, if Ms. Greene claims she is totally and permanently disabled because of an anxiety disorder, she could apply to the United States Department of Education for an administrative total and permanent disability discharge of her student loan obligation as set forth in 34 C.F.R. § 685.213 (2011)).

[33] As a result of the findings of fact and conclusions of law, the Court further finds that the motion for judgment on partial findings pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure made by the United States should be denied as moot.

for the Eastern District of Virginia.  Except as provided in Federal Rules of Bankruptcy Procedure

8002(b) and 8002(c), any notice of appeal must be filed with the Clerk of this Court within fourteen

(14) days of the date of entry of the order to be entered by the Court.  The filing fee for a notice of

appeal is $298.00.

Upon entry, the Clerk shall transmit a copy of this Memorandum Opinion to Luria Nicole

Greene, 727 Halifax Avenue, Hampton, Virginia 23663, by first class mail, postage prepaid, as well

as through the Court's Bankruptcy Noticing Center.  The Clerk shall also transmit, by electronic

means, a copy of this Memorandum Opinion to Gregory D. Stefan, Assistant United States Attorney;

and to Debera F. Conlon, Assistant United States Trustee.

**Entered this 6th day of December, 2012, in the Eastern District of Virginia.**

_____
STEPHEN C. ST. JOHN
United States Bankruptcy Judge